# HAEUSSLER et al., Appellants, v. CITY OF ST. LOUIS et al.

## In Banc, July 2, 1907.

1. **CITIES: Power to Contract Debt.** Any city in this State is permitted and authorized by statute to contract a debt for any purpose authorized by its charter or by any general law of the State.

2. ———: ———: **Bridge Across Mississippi River.** The city of St. Louis has been expressly authorized by the general statute of 1905 to issue its bonds and to use the proceeds of the sale thereof in constructing and maintaining a municipal bridge across the Mississippi river, either as a toll or free bridge, for public use by railroads, street cars, vehicles of all kinds and pedestrians, and to buy or condemn land, on either side of said river, to be used in providing approaches to said bridge. Said bonds, the amount of the indebtedness thereby created being within the maximum amount the city is permitted by the Constitution to incur, are valid.

3. ———: ———: ———: **Express Authority: Constitutional.** Such express authority has been granted to the city by the Act of 1905, and by the charter of the city, and by the Act of Congress. And the charter authority, while not necessary, is but cumulative of the statutory authority granted by the General Assembly, and the authority to enact such a statute was reserved to the General Assembly by section 53 of article 4 of the Constitution, which permits the Legislature to pass a local or special law "for the erection of bridges crossing streams which form boundaries between this and any other State."

4. ———: ———: ——— : **Public City Purpose.** Such a bridge is a public highway and a public city purpose, nor is it any the less a public city purpose because a part of the public highway is beyond the city limits.

5. ———: ———: ———: **For Use of Railroads.** Since the ordinances provide that the city is to be the absolute owner of the proposed bridge and its approaches, and is to have the sole control and management thereof, it cannot be said that they are in violation of the constitutional provision prohibiting municipalties to lend their credit or to grant public money or thing of value in aid of or to any individual or corporation. The fact that the city, under the terms of the ordinances, may grant to railroad and street car corporations the right to use the bridge, does not change the ownership or control, for that is true of every public highway in the city.

6. ———: ———: ———: **Into Illinois.** And as the city already, by grants from the State, has authority to construct a public highway, for a municipal public purpose, beyond its corporate limits, Congress, under the clause of the Federal Constitution giving it power to regulate commerce among the States, has the authority to extend that power of the city to a public highway or bridge across the Mississippi river, and to give it authority to there condemn or purchase lands for the bridge's approaches. [Per **Graves, J.,** with whom a majority of the judges do not concur.]

7. ———: ———: ———: **Issuing Bonds.** The city has express authority, both in the Constitution and its charter, to issue its negotiable bonds as evidence of the debt contracted for constructing and maintaining the bridge.

8. ———: ———: ———: **Constructing and Maintaining.** There is absolutely no restrictions as to the purposes for which the city may incur an indebtedness, provided the purpose is a legitimate, authorized municipal public purpose. It can incur an indebtedness for maintaining the bridge as well as for constructing it. [State **ex rel.** Chillicothe v. Wilder, 200 Mo. 97, distinguished.]

Appeal from St. Louis City Circuit Court.—*Hon. Wm. M. Kinsey,* Judge.

AFFIRMED.

*I. H. Lionberger* and *Charles S. Reber* for appellants.

(1) A municipal corporation has no power to borrow money and issue its negotiable bonds for corporate purposes, unless authority to do so be expressed in its charter or necessarily implied as being essential to carry into effect powers which are expressly granted. Barnet v. City of Denison, 145 U. S. 135; City of Breakam v. Bank, 144 U. S. 173; Luther v. Wheeler, 4 L. R. A. 750; sec. 10, art. 5, Charter; St. Louis v. Telephone Co., 96 Mo. 623; Joplin v. Leckie, 78 Mo. App. 8. (2) The Act of 1905 (Laws 1905, p. 94), while it authorizes all cities in the State having one hundred thousand

inhabitants or over to build or purchase a bridge for public use by railroads, street cars, vehicles and pedestrians over a river forming a boundary between this and other States, and to acquire, use and retain land, etc., for approaches to such bridge, does not authorize any city to utter bonds for the purpose of constructing or purchasing such a bridge. (3) Section 26, article 3, paragraph 5 of the charter as amended in 1903 provides that the Mayor and assembly shall have power within the city, by ordinance not inconsistent with the Constitution or any law of this State, or this charter, to borrow money on the credit of the city by the issue or sale of bonds for the construction, reconstruction and extension of bridges and viaducts and the purchase of land for such purposes. Such paragraph obviously contemplates the construction of bridges and viaducts within the city and cannot be properly construed to authorize the issue of bonds for the construction of bridges outside of the city of St. Louis. Power to build a bridge outside of the city did not then exist. (4) Paragraph first of section 26, article 3, confers upon the city of St. Louis power to borrow money and issue bonds for "such other purposes as may be authorized by this charter or by the Constitution of this State in force at the time." Assuming that the fifth paragraph is to be construed as authorizing the construction of bridges and viaducts within the city, the charter nowhere else in terms authorizes the issue of bonds for the construction of a bridge across the Mississippi river and partly without the limits of the city of St. Louis. The general law of 1905 was not in force when the foregoing provisions of the charter of St. Louis were adopted by the people of the city, and while it confers upon all cities of the first class power to construct bridges across the river, it does not require any city to construct such a bridge; so that it is competent for the city of St. Louis, notwithstanding such act, to by

its own charter withhold the power to construct such a bridge from its municipal authorities. Nothing in the charter itself of St. Louis either authorizes or requires the construction of a bridge across the Mississippi river, and nothing in the Constitution of the State confers such authority. (5) Paragraph 9 of section 26, article 3 of the charter, while it authorizes the borrowing of money and the issue of bonds for the construction of any other public improvement of a permanent character which the city is or may be authorized or permitted under its charter to construct, confers no greater authority than is conferred by paragraph first of the same section, inasmuch as the charter nowhere in terms authorizes the construction of a bridge across a river outside of the city limits. (6) An act which permits a city to construct a municipal bridge outside of the State which creates it, and beyond the power and jurisdiction of its creator, is unconstitutional. Becker v. LaCross, 99 Wis. 414, 40 L. R. A. 829; Schuder v. Wenasha, 118 Wis. 298. (7) The ordinance under which the bonds sought to be enjoined are proposed to be issued authorizes bonds to be uttered not only for the construction of a bridge across the river, but for its maintenance. Power to utter bonds for the construction or reconstruction of a bridge is not broad enough to confer power to issue bonds for its maintenance. The maintenance of a bridge is not a public improvement of a permanent character. Chillicothe case, 200 Mo. 97; Verdin v. St. Louis, 131 Mo. 26. The issue and use of the proceeds of city bonds in order to provide for the exclusive use and benefit of railroad companies separate approaches to a bridge across the river, of great cost and value, and a separate part of the bridge structure itself, whether of one platform constructed for all other uses, or a separate and distinct platform, will result in the appropriation by the city of St. Louis of something of value to railroad cor-

porations, and to the lending of the credit of the city in aid of railroad corporations, within the meaning of the Constitution of this State.

*Charles W. Bates, Benjamin H. Charles, E. C. Crow, C. F. Ziebold* and *Rassieur, Schnurmacher & Rassieur* for respondents.

(1) The city has the power to construct and maintain a bridge across the Mississippi river. Laws 1905, p. 94; Acts of Congress of June 25, 1906, and March 23, 1906; charter of St. Louis, art. I, sec. I; art. 3, sec. 26, par. 14. The bridge which the city expects to build under the provisions of Ordinances 22366 and 22674 is the kind of a bridge authorized by the Act of the Legislature of April 6, 1905. (See Proposition I in sec. 4 of Ordinance 22366, and sec. 5 of Ordinance 22674, and compare the same with the Act of 1905.) (a) The construction and maintenance of a bridge are peculiarly within the sphere of municipal activity. It is a municipal purpose. It is a "city" purpose. It is a "work of internal improvement." It is a public improvement. Chapter 84, R. S. 1899 (illustrating policy of the State to consider bridges as parts of highways); Charter of St. Louis, art. 3, sec. 26, Par. 2; 1 Dillon on Mun. Corp. (4 Ed.), sec. 510, pp. 577 and 578; Dodge County v. Chandler, 96 U. S. 205; U. S. v. Dodge County, 110 U. S. 162; South St. Paul v. Lamprecht, 88 Fed. 449; Angell on Highways, sec. 38; Elliott on Roads & Streets, p. 21. Bridges are regarded as public highways. 3 Abbott on Mun. Corp., sec. 1024, p. 2318; County Comrs. v. Chandler, 96 U. S. 209; Elliott on Roads & Streets, p. 21. The Act of 1905 and both the ordinances, 22366 and 22674, declare that this bridge is to be for "public use." A public bridge is part of a highway. 4 Am. and Eng. Ency. Law (2 Ed.), 920; McPheeters v. Bridge Co., 28 Mo. 467; 2 Abbott on Mun. Corp., sec. 422. That the law holds municipalities to

the proper care, repair and maintenance of highways, including bridges, see: Jordan v. Hannibal, 87 Mo. 673; Walker v. Kansas City, 99 Mo. 647; Walker v. Point Pleasant, 49 Mo. App. 244; see also, St. Louis Charter, art. 3, sec. 26, par. 2. (b) The Legislature may authorize cities to extend their activities and to hold and manage property beyond their borders. Hafner v. St. Louis, 161 Mo. 42; Chambers v. St. Louis, 29 Mo. 375; South St. Paul v. Lamprecht, 88 Fed. 454; People ex rel. v. Kelly (Brooklyn Bridge Case), 76 N. Y. 475; Matter of Mayor of New York, 99 N. Y. 569; Pittsburg v. Brace, 158 Pa. St. 174; Minnesota Land Co. v. Billings, 111 Fed. 972; Newman v. Ashe, 9 Baxt. (Tenn.) 380. (c) Under the power to regulate commerce among the States, Congress may authorize, and by Act of June 25, 1906, has authorized, the city of St. Louis to construct the bridge across the Mississippi river, and to that end to acquire by purchase or condemnation the necessary property in both Illinois and Missouri. Luxton v. North River Bridge Co., 153 U. S. 525. And by its charter provisions the city has the power of eminent domain within its territorial limits. Charter, art. 6, sec. 12. (2) The power to construct and maintain this bridge having been expressly conferred upon the city, it is expressly authorized to issue its bonds therefor. Sec. 12, art. 10 of the Constitution of Missouri, as amended at the general election held in November, 1902. (Laws 1901, pp. 264, 265); Charter of St. Louis, art. 3, sec. 26, 1st paragraph, as amended by the charter amendment election held October 22, 1901, and as further amended at the election held June 23, 1903; sections 6350-6354, inclusive, R. S. 1899, art. 13, chap. 91. (3) The construction and maintenance of this municipal bridge by the city of St. Louis is not the giving of aid to any individual or corporation, nor is it otherwise in violation of any constitutional prohibition. Sun Printing & Publishing Assn. v. Mayor,

etc., of New York, 152 N. Y. 257, 37 L. R. A. 788; Printz
v. Crocker, 166 Mass. 347, 32 L. R. A. 610; Brooks
v. Philadelphia, 162 Pa. St. 123; South St. Paul v. Lam-
precht, 88 Fed. Rep. 454; Walker v. Cincinnati, 21 Ohio
St. 14; Pleasant Township v. Ins. Co., 138 U. S. 74;
County Court v. Griswold, 58 Mo. 175; Garrolt v. Mo-
berly, 103 U. S. 580. (4) "The General Assembly of
the State of Missouri" has the same legislative power
over the city of St. Louis as it has over any other por-
tion of the State. Its power is not limited in the least
by the constitutional provisions authorizing the city
of St. Louis to frame and enact its own charter. Con-
stitution, art. 4, sec. 1; art. 9, secs. 20, 23, 25; State ex
rel. v. Mason, 152 Mo. 52; Kansas City v. Stigmiller,
151 Mo. 204; State ex rel. v. Walton, 69 Mo. 566; Spald-
ing v. Brady, 128 Mo. 653; State ex rel. v. Higgins, 125
Mo. 364; Kenefick v. St. Louis, 127 Mo. 1; Ewing v.
Hoblitzelle, 85 Mo. 75; State ex rel. v. Ossley, 122 Mo.
68; State ex rel. v. Mason, 155 Mo. 486; State ex rel.
v. Board of Education, 141 Mo. 45; State ex rel. v.
Railroad, 117 Mo. 12; State ex rel. v. Bell, 119 Mo.
70; State ex rel. v. Miller, 100 Mo. 439; State ex rel.
v. Police Commissioners of Kansas City, 71 S. W. 215;
State v. Seebold, 192 Mo. 720; Bagley v. St. Louis, 149
Mo. 122; St. Louis v. Meyer, 185 Mo. 583; State ex rel.
v. Tel. Co., 189 Mo. 83.

GRAVES, J.—Plaintiffs, resident taxpayers of
the city of St. Louis, for themselves, and for other
taxpayers of said city who may choose to join them,
bring their action in equity to restrain the city of St.
Louis and the other defendants, Wells, Player and
Franciscus, who are respectively the mayor, comp-
troller and treasurer of said city, to enjoin the issuance
and sale of thirty-five hundred negotiable bonds of the
city of St. Louis, of the denomination of one thousand
dollars, each numbered respectively from one to thirty-

five hundred, inclusive, which bonds they charge the defendants are threatening to issue under and by virtue of a so-called authority given to defendants by an ordinance of said city numbered 22674, and entitled: "An Ordinance declaring the result of the special election called by ordinance number twenty-two thousand three hundred and sixty-six, held on June twelfth, nineteen hundred and six, and directing the issue of bonds of the city of St. Louis in the sum of eleven million two hundred thousand dollars as authorized by the vote at said election."

The particular bonds, the validity of which is questioned in this proceeding, are described in section 5 of the ordinance aforesaid, thus:

"Section 5. Said bonds shall have engraved thereon the words 'Saint Louis Public Buildings and Public Improvement Bonds,' and shall be numbered consecutively from one to eleven thousand two hundred, both inclusive. The bonds and the proceeds from the sale of the respective bonds shall be used exclusively for the following separate purposes, to-wit: One, bonds numbered from one to thirty-five hundred, both inclusive (three million five hundred thousand dollars), and the proceeds from the sale thereof, shall be used for the construction and maintenance of a municipal bridge for public use by railroads, street cars, vehicles of all kinds and pedestrians over and across the Mississippi river, and for the purchase of land to be used for approaches thereto."

The whole issue of eleven million two hundred thousand dollars, as provided for by this ordinance, is for nine different public purposes, all being for public improvements of some kind. Each of the other eight issues is described in section 5 of the ordinance, in a manner similar to the description of the bonds in question, hereinabove set out. The ordinance in other sections declares the result of the election called by

ordinance No. 22366 and held June 12, 1906, authorizes the issuance and sale of eleven million two hundred thousand dollars bonds, including the three million five hundred thousand dollars questioned in this suit, and provides the form of the bonds and coupons and how to be signed and attested, and for the payment of the principal and interest of said bonds, and to that end makes provision for a sinking fund out of which to pay the principal. To provide the payments of interest and the creation of this sinking fund an annual tax is authorized. The plaintiffs by their petition attack the validity of these bonds in this language:

"That the city of St. Louis has no power or authority to use its credit or to issue its bonds, or to levy and collect taxes, for any such purpose, for that said bonds and such use thereof are prohibited by the Constitution and laws of the State of Missouri and the charter of the city of St. Louis, in the following particulars: Said proposed bonds, together with the existing indebtedness of the city, will in the aggregate exceed five per cent of the value of the taxable property therein, to-wit:

"Section 6 of article 9 of the Constitution provides that no city shall make any appropriation or donation or loan its credit to or in aid of any railroad or other corporation or association; and section 47 of article 4 of said Constitution provides that the General Assembly of the State of Missouri shall have no power to authorize any city to lend its credit or to grant public money or any thing of value in aid of or to any individual, association or corporation whatsoever; but notwithstanding said provisions of the Constitution aforesaid, the city of St. Louis and the officers herein made parties defendant, propose, pursuant to and in compliance with the terms of said ordinance, to issue the bonds hereinbefore mentioned and to use the proceeds thereof to construct a bridge across the Mississippi

river which will and must be, under said ordinance, so designed and made that a part thereof, of great cost, will be set apart and appropriated to the sole and exclusive use and benefit of railroad corporations; and thereby to lend the credit of the said city and grant public money and property in aid of such corporations.

"Paragraph first of section 26 of article 3 of the charter of the city of St. Louis, as amended the twenty-third day of June, A. D. 1903, provides that negotiable bonds of the city in the form of coupon bonds or registered bonds, or both, or coupon bonds with the privilege of registration, may be issued from time to time within the limits prescribed by the Constitution of this State in force at the time, for any one or more of the following purposes, to-wit: 5th, for the construction, reconstruction and extension of bridges and viaducts and the purchase of land for such purposes; but notwithstanding the provision of the charter aforesaid, the city of St. Louis and the officers herein made parties defendant, propose to issue the bonds aforesaid not only for the construction, reconstruction and extension of a bridge beyond the limits of said city, but for the maintenance thereof, and to thereby appropriate the proceeds of bonds in a manner not authorized by the charter of the city of St. Louis.

"That plaintiffs are without adequate remedy at law, and that the mayor, comptroller and treasurer aforesaid, unless restrained by this honorable court, will issue and sell said bonds pursuant to the terms of said ordinance, notwithstanding that under the Constitution of the State and the charter of the city of St. Louis, said city is not authorized to issue bonds in that behalf."

The prayer of the petition is for a perpetual injunction forever restraining the issuance and sale of said bonds.

The amended answer and reply will be set out in

full for the reason that the admissions therein contained constitute the facts of this case. The amended answer is in this language:

"AMENDED ANSWER.

"Come now the defendants in the above-entitled cause, and with leave of court, first had and obtained, file this their amended answer to the petition:

"The defendants admit that the plaintiffs are citizens of the State of Missouri and residents and taxpayers of the city of St. Louis, and that they are the owners of property of great value, real and personal, in said city, upon which taxes are, and are required to be, levied and collected for public purposes, under the general and local laws of said State, and that all the taxes heretofore levied upon such property so owned by them, which are payable, have been paid, and none are delinquent; that the city of St. Louis is a municipal corporation, duly organized and existing under the laws of the State of Missouri; that the defendant Rolla Wells is the mayor, the defendant James Y. Player the comptroller, and the defendant James M. Franciscus the treasurer of said city; that the municipal assembly of the said city did ordain and adopt an ordinance numbered 22674, as alleged and set out in the petition, and that the said ordinance so adopted was approved by the defendant Rolla Wells, as mayor of the said city, on the twenty-sixth day of November, 1906.

"The defendants further admit that under and pursuant to the terms and provisions of the said ordinance and the authority thereby conferred, the defendants propose and are about to cause to be made, and to issue and sell thirty-five hundred negotiable bonds of the city of St. Louis, of the denomination of one thousand dollars each, numbered respectively from one to thirty-five hundred inclusive, with coupons attached,

whereby the city of St. Louis will agree to pay to the bearer, in gold coin of the United States, the sum of three million five hundred thousand dollars, with interest thereon, as in said ordinance provided, and that the proceeds from the sale of the said bonds are to be applied to and used for the building of a municipal bridge under the control of said city for public use as a public highway, for the public benefit, and for the general use, as any other street or highway of the city, by railroads, street cars, vehicles of all kinds and pedestrians, over and across the Mississippi river, and for the purchase of land to be used for approaches thereto, as in the said ordinance provided.

"The defendants further admit that the annual tax provided for in said ordinance, as alleged in the petition, will be and becomes a burden upon the property of the plaintiffs and other taxpayers of the city of St. Louis.

"Further answering the defendants deny each and every other allegation of the petition.

"Further answering the defendants allege that under and by virtue of the authority of an act of the General Assembly of the State of Missouri, approved April 6, 1905, entitled, 'An Act authorizing and empowering cities of one hundred thousand inhabitants and over to build, or acquire by purchase, lease, gift or otherwise, within or without the limits of said city, a bridge or bridges, or a tunnel or tunnels, for public use by railroads, street cars, vehicles of all kinds and pedestrians, over or under rivers and streams within this State, or forming a boundary between this and other States, and to acquire, hold, use and retain, by purchase, lease, gift or otherwise, land to be used as approaches and in the construction, use and operation of said bridge or bridges, tunnel or tunnels, in this and other States, and to operate, use and maintain said bridge or bridges, tunnel or tunnels, either as toll or free bridges or tun-

nels,' and the Act of Congress of June 25, 1906, entitled, 'An Act to authorize the city of St. Louis, a corporation organized under the laws of the State of Missouri, to construct a bridge across the Mississippi river for use by railroads, street cars, vehicles of all kinds and pedestrians, to acquire land necessary therefor and for approaches thereto, and to maintain the same when constructed.'

"Further answering the defendants allege that under the authority of and in compliance with the provisions of section 12 of article 10 of the Constitution of Missouri, as amended at the general election held on the first Tuesday after the first Monday in November, 1902, and under the statutes of the State of Missouri, particularly sections 6350 to 6354 inclusive of the Revised Statutes of Missouri of 1899, and the amendments thereto, and under paragraph 1 of section 26 of article 3 of the charter of the city of St. Louis as amended in 1903, the said city of St. Louis, through its mayor and Municipal Assembly, did duly pass and enact Ordinance Number 22366, entitled, 'An Ordinance authorizing the issue of bonds of the city of St. Louis not exceeding in the aggregate eleven million two hundred thousand dollars, in the respective amounts and for the respective purposes herein specifically stated, upon two-thirds of the voters of the city of St. Louis voting thereon, assenting thereto, and the holding of an election for the purpose of submitting said proposition to the voters,' approved April 3, 1906; that in pursuance of the provisions of said ordinance an election was duly held in the city of St. Louis, on the twelfth day of June, 1906, in conformity with all the legal provisions and requirements applicable thereto, at which election there was submitted to the qualified voters of the city of St. Louis the nine separate propositions for the increasing of the indebtedness of said city, as set forth in said Ordinance Number 22366, and at which said election

more than two-thirds of the qualified voters of the city voting at said election voted in favor of increasing the said indebtedness of the said city in the amounts and for the purposes in said ordinance set forth.

"Said ordinance was and is in the words and figures as follows, to-wit:

" 'An Ordinance authorizing the issue of bonds of the city of St. Louis not exceeding in the aggregate eleven million two hundred thousand dollars, in the respective amounts and for the respective purposes herein specifically stated, upon two-thirds of the voters of the city of St. Louis voting thereon, assenting thereto, and the holding of an election for the purpose of submitting said proposition to the voters.

" ' Be it ordained by the Municipal Assembly of the City of St. Louis, as follows:

" 'Section One. An election shall be held in the city of St. Louis on Tuesday, the twelfth day of June, nineteen hundred and six, at which election there shall be submitted to the qualified voters of the city of St. Louis various separate propositions to issue bonds in amounts, respectively, for the specific purpose hereinafter stated numbered from one to nine, both inclusive, the same being authorized by an amendment to section twelve of article ten of the Constitution of the State of Missouri, adopted at the general election held Tuesday, the fourth day of November, A. D. nineteen hundred and two, and by section twenty-six of article three of the charter of the city of St. Louis, as amended at special elections held on October twenty-second, nineteen hundred and one, and June twenty-third, nineteen hundred and three, respectively, and by the Constitution and laws of the State and the charter of said city of St. Louis.

" 'Section Two. Notice of said election shall be given by publication of this ordinance in the newspapers doing the city printing for at least twenty days

prior to the day of holding the same, to-wit: In the St. Louis World and Abend-Anzeiger. Proofs of said publication, under the oath of the respective publishers, or editors of said newspapers, shall be filed with the City Register.

" 'Section Three. The Board of Election Commissioners shall provide the ballots and conduct the election and shall certify to the results thereof according to law to the Municipal Assembly of the city of St. Louis. The ballots to be used at said election shall be in the following form:

" 'Proposition One—For the construction and maintenance of a municipal bridge for public use by railroads, street cars, vehicles of all kinds and pedestrians over and across the Mississippi river and for the purchase of land to be used for approaches thereto, three million five hundred thousand dollars.

" ' "For increase of debt, Proposition One—Yes.'

" ' "For increase of debt, Proposition One— No." '

[Then follows the other eight propositions in similar manner.]

" 'Those of the voters at said election who assent to the said increase of indebtedness, shall erase from their ballot the word "No" after any one or more of said propositions which they favor. And those of the voters who do not favor the adoption of said increase, shall erase from their ballot the word "Yes" after any one or more of said propositions to which they are opposed; the former of which in each case shall be taken as a vote assenting to such increase of indebtedness, and the latter as dissenting therefrom. If any one or more of the propositions for the issuing of bonds be carried by receiving in their favor votes of two-thirds of the qualified voters voting thereon at such election, then bonds in the amount and for the purpose or purposes designated may be issued.

" 'Section Four. The proceeds from the sale of the amount of bonds authorized to be issued by an affirmative vote, as above stated, for any one of the following specific purposes designated in this section as Proposition One, Two, Three, Four, Five, Six, Seven, Eight and Nine, shall be used only for such purpose. Proposition One—For the construction and maintenance of a municipal bridge for public use by railroads, street cars, vehicles of all kinds and pedestrians over and across the Mississippi river and located within the corporate limits of said city of St. Louis and the State of Illinois, and for the purchase of all lands to be used for approaches in connection therewith, and which said bridge shall at all times be and forever remain a free bridge; provided, however, the city reserves the right to grant franchises for the use of such bridge for public service purposes upon such terms and compensation as may be prescribed by ordinance; and, provided further, that no such franchise shall confer an exclusive right in respect to such public service purposes upon the grantee thereof, three million, five hundred thousand dollars: [Then follow the provisions for the other eight propositions.] Provided, that if the sum voted for any one or more of the above purposes should prove more than sufficient, or if it is finally judicially determined that the sum voted for any one of the above purposes cannot be used for such purpose, then such sum or such excess, shall be placed to the credit of the general sinking fund of the said city of St. Louis.

" 'Approved April 3, 1906.'

"The defendants further aver that under the authority of the provisions of the Constitution of Missouri, the statutes of Missouri, and the charter of the city of St. Louis, the said city of St. Louis, by the vote of the people of June 12, 1906, above mentioned, has the authority to issue its bonds for the purpose of

constructing and maintaining a bridge across the Mississippi river, as alleged in the petition.

"The defendants further aver that the amount of indebtedness which the city of St. Louis is authorized to incur, under the above proceedings, and which it is about to incur, together with all its other indebtedness, excluding the amount of bonds assumed by the said city in the Scheme of Separation from the county of St. Louis, and the amount of bonds issued by said city in the construction and improvement of waterworks, the payment of which has been provided from the revenue of said waterworks, is less in the aggregate than five per centum on the value of the taxable property in said city ascertained by the assessment next before the last assessment for State and county purposes; that the value of the taxable property in the city of St. Louis assessed at the assessment next before the last assessment for State and county purposes, to-wit, on and as of the first day of June, 1905, was four hundred and ninety-three million, three hundred and sixteen thousand, eight hundred and forty-five dollars ($493,316,845); that on the twelfth day of June, 1906, the total outstanding municipal indebtedness was twenty-one million, nineteen thousand, two hundred and seventy-eight and thirty one-hundredths dollars ($21,019,278.30), including bonds assumed by said city in the Scheme of Separation from the county of St. Louis amounting, on said date, to four million, nine hundred and sixty-six thousand dollars ($4,966,000), and bonds issued by said city in the construction and improvement of waterworks, the payment of which was provided from the revenue of said waterworks, amounting to five million, seven hundred and eighty-three thousand dollars ($5,783,000); that excluding the said bonds of the county of St. Louis assumed by the said city in the Scheme of Separation and the said waterworks bonds, the total municipal indebtedness

of the said city on the said twelfth day of June, 1906, was ten million, two hundred and seventy thousand, two hundred and seventy-eight and thirty one-hundredths dollars ($10,270,278.30); that at the present time the total outstanding municipal indebtedness of the city of St. Louis is twenty million, seven hundred and ninety thousand, two hundred and seventy-eight and thirty one-hundredths dollars ($20,790,278.30), including bonds assumed by the city in the Scheme of Separation from the county of St. Louis, amounting to four million, nine hundred and sixty-six thousand dollars ($4,966,000) and including also bonds issued by said city in the construction and improvement of waterworks, the payment of which has been provided from the revenue of said waterworks, amounting to five million, seven hundred and sixty-eight thousand dollars ($5,768,000), and excluding same that the total remaining outstanding indebtedness of said city of St. Louis at the present time is ten million, fifty-six thousand, two hundred and seventy-eight and thirty one-hundredths dollars ($10,056,278.30).

"Wherefore, having fully answered, the defendants pray that the bill of complaints be dismissed, and that they, the defendants, be discharged with their costs."

The reply is in this language:

"REPLY.

"Now come the plaintiffs and admit the allegation of the answer, except the allegation that said proposed bridge will be a public highway for the public benefit and for the general use as any other street of the city; which said allegation plaintiffs deny."

By the oral testimony it was shown that the approach to the bridge on the east side would have to be a mile or a mile and a half long, especially for the use

of steam railways; that it would be impracticable to use only one approach to accommodate all four classes of users; but such could be done. It was also shown that all traffic could be put on one plane or level, or that the bridge could be double decked, and the classes of traffic divided.

Upon this record, the court *nisi* dismissed the plaintiffs' bill, entered judgment for costs against them, and they, after unsuccessful motion for new trial, duly perfected their appeal.

I.    This case is before us on a practically admitted state of facts. The admissions in the answer and the admissions in the reply are supplemented by the testimony of only one witness, and his testimony of doubtful probative force upon any of the live issues in the case. From the admitted facts, the indebtedness authorized by the vote of the qualified voters is within the constitutional restriction for incurring indebtedness by the city of St. Louis. That is to say, the total outstanding debt, which under the Constitution can be taken into account, when added to the proposed indebtedness, does not make a total indebtedness in excess of five per centum of the assessed value of the taxable property. [See sec. 12, art. 10, Missouri Constitution, 1875, as amended; Mo. Ann. Stat. 1906, vol. I, p. 287.] This proposition stands conceded by the record facts. The regularity of the proceedings and the requisite vote for the incurring of this proposed debt is apparent from the record, so that if the proposed debt is for an authorized purpose, and the evidencing of such proposed debt by negotiable bonds is authorized by law, then no valid reason can be assigned for restraining the defendants from issuing and selling said bonds. To the discussion of these questions, and the various side issues injected therein and engrafted thereon, by learned counsel, we next proceed.

II.  Plaintiffs contend that the proposed debt is not for an authorized purpose; that the city has no power or authority to either build or maintain a public bridge across the Mississippi river.

Express State authority is found in the act of our Legislature approved April 6, 1905. [Laws 1905, p. 94.] The act reads thus:

"Section 1.  All cities in this State having one hundred thousand inhabitants or over are hereby given the power and authority to build or acquire by purchase, lease, gift or otherwise, within their corporate limits or within a reasonable distance outside thereof, a bridge or bridges, or a tunnel or tunnels for public use by railroads, street cars, vehicles of all kinds and pedestrians, over or under rivers and streams in Missouri or those forming a boundary between this and other states, and to acquire, hold, use and retain by purchase, lease, gift or otherwise, land to be used for approaches for and in the construction, operation and maintenance of said bridge or bridges, tunnel or tunnels, in this and other States, and to maintain, use and operate said bridge or bridges, tunnel or tunnels, either as toll or free bridges or tunnels, as may by said cities be deemed expedient."

Express Federal authority is granted by Act of Congress of June 25, 1906. The necessary portions thereof read as follows:

"An Act to authorize the city of St. Louis, a corporation organized under the laws of the State of Missouri, to construct a bridge across the Mississippi river.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that the city of St. Louis, a corporation organized under the laws of the State of Missouri, be, and is hereby, authorized to construct, maintain and operate a railroad, wagon and foot passenger

bridge, and approaches thereto, across the Mississippi river at St. Louis, Missouri, in accordance with the provisions of the act entitled, 'An Act to regulate the construction of bridges over navigable waters,' approved March twenty-third, nineteen hundred and six.

"Section 2. That for the purpose of carrying into effect the objects of this act, the city of St. Louis may receive, purchase and also acquire by lawful appropriation and condemnation in the States of Illinois and Missouri, upon making proper compensation, to be ascertained according to the laws of the State within which the same is located, real and personal property and rights of property, and may make any and every use of the same necessary and proper for the construction, maintenance and operation of said bridges and approaches consistent with the laws of the United States and of said States respectively."

By section 1, article 1, of the city charter, the city of St. Louis "may purchase, receive and hold property, real or personal, within said city, and beyond the limits of the city, to be used . . . for the establishment of a hospital or hospitals, for the reception of persons infected with contagious or other diseases; for a poorhouse or poorhouses, workhouse, house of correction, *or for any other purpose.* . . ."

Paragraph 14, section 26, article 3, of the city charter, provides:

"Fourteenth. Finally, to pass all such ordinances, not inconsistent with the provisions of this charter, or the laws of the State, as may be expedient, in maintaining the peace, good government, health and *welfare of the city, its trade, commerce and manufactures* and to enforce the same by fines and penalties, not exceeding five hundred dollars, and by forfeitures not exceeding one thousand dollars; *to purchase, rent or lease within the limits of the city or elsewhere, any real or personal property,* and to manage, sell or lease, or otherwise dis-

pose of the same, for such purposes and considerations as they may deem proper for the *public welfare* of the city, and to provide for the enumeration of the inhabitants of the city."

The fifth and ninth paragraphs of the same section, read:

"Fifth. For the construction, reconstruction and extension of bridges and viaducts and the purchase of land for such purposes."

"Ninth. For the construction, reconstruction, purchase, acquisition or extension of any other public buildings or *any other public improvements* of a permanent character which the city is or may be authorized or permitted under its charter to construct, reconstruct, purchase, acquire or extend, and also to purchase land for the same; and the enumeration of the specific purposes in the preceding paragraphs numbered one to eight, inclusive, shall not be construed to qualify or limit the general provisions of this paragraph nine."

And in paragraph ten of the same section we have this provision: "The authority above given to issue bonds for any of the purposes aforesaid is cumulative and shall not be construed to take away, affect or impair any authority of the city or any of its officers to make *any public improvements under* any other provisions of the charter of the city or of *the laws of the State*, but the authority above given shall be construed as an additional authority."

Section 53, article 4, Constitution of Missouri, 1875, provides: "The General Assembly shall not pass any local or special laws . . . relating to ferries or bridges, or incorporating ferry or bridge companies, *except for the erection of bridges crossing streams which form boundaries between this and any other State. . . .*"

Apropos, we have section 6350, Revised Statutes 1899, providing:

"Sec. 6350. *Cities allowed to incur indebtedness.*
—The various cities, towns and villages in this State,
whether organized by special charter or under the gen-
eral laws of the State, may contract a debt or debts
in excess of the annual income and revenue for any
such year, for any purpose authorized in the charter
of such city, town or village, or by a general law of
the State, upon the assent of two-thirds of the legal
voters of such city, town or village, voting at an elec-
tion held for that purpose: Provided, such indebted-
ness so to be contracted shall not, with the existing
indebtedness of such city, town or village, exceed in
the aggregate five per cent on the value of the taxable
property therein, to be ascertained by the assessment
next before the last assessment for State and county
purposes previous to the incurring of such indebted-
ness; and provided further, that the proper authorities
of every such city, town or village incurring such in-
debtedness shall, before or at the time of doing so,
provide for the collection of an annual tax sufficient
to pay the interest on such indebtedness as it falls due,
and also to constitute a sinking fund for the payment
of the principal thereof, within twenty years from the
time of contracting the same."

In section 6354, Revised Statutes 1899, we have
this language: "The provisions of the preceding four
sections shall apply to all cities, towns and villages in
this State, whether organized by special charter or
under the general laws of the State, any provision in
any special charter of any city, town or village in the
State to the contrary notwithstanding."

So that the provisions of section 6350 and the suc-
ceeding three sections are by statute made applicable
to the city of St. Louis, as well as to all other cities,
towns and villages in the State. The language of the
sections quoted is clear, and if further authority were
required, this court has always looked upon Kansas

City and St. Louis as cities with special charters, both of which are provided for by article 9 of the Constitution. [City of Westport v. Kansas City, 103 Mo. 141; St. Louis v. Meyer, 185 Mo. 1. c. 592.] Citation of authority is unnecessary because the sections themselves are made applicable to *all* cities *within* the State.

By Revised Statutes 1899, section 6350, supra, St. Louis, or any other city in this State, "may contract a debt or debts in excess of the annual income . . . for *any purpose* authorized in the charter . . . or by any general law of the State."

In this section it is further provided, as above shown, that the amount of such debts, with the other outstanding debts of the city, shall not exceed five per cent on the assessed taxable property, and provision must be made for the payment thereof in twenty years, as well as the interest thereon.

But the point we desire to emphasize is that the city is permitted and authorized by this statute to contract said debt for any purpose authorized by its charter, *"or by any general law of the State."* The statute quoted does not limit it to a purpose mentioned and authorized by the charter but goes further and says, "for any purpose" authorized "by any general law of the State." The Act of 1905, supra, is a general law of the State, and was such when the special election was held by the city of St. Louis, by which the assent of the voters was obtained for the issuance and sale of these bonds. This Act of 1905 is express authority for the building of this bridge. Not only so, but it is express authority to maintain such bridge. To use the language of the law itself it is express authority "to *maintain,* use and operate said bridge or bridges, tunnel or tunnels, either as toll or free bridges or tunnels. . . ." In addition to this, the amended char-

ter in the provisions which we have above quoted, are sufficiently clear to furnish express authority for the building of the proposed bridge.

This charter authority, in our judgment, is but cumulative authority, for if section 6350 and the preceding three sections mean anything at all when supplemented by the Act of 1905, there is ample express authority in so far as the State can grant it. By this section 6350, it was not necessary to have express charter authority, but it is sufficient if the public municipal purpose is one authorized "by any general law of the State." The Act of 1905 is a general law of the State and under the provision of section 6350 must be read in connection with the charter, or in fact read into the charter. And by section 53, article 4, Missouri Constitution, the framers of the Constitution even reserved to the Legislature the right to provide for the construction of such bridges by local or special laws. So that we have no hesitancy in saying that there is ample authority both in the laws of the State and the charter of the city for the construction of the contemplated bridge and for the incurring of a debt therefor, to be paid, of course, within the time prescribed by law and in the manner so prescribed.

In all this, we recognize fully the rule that debts cannot be contracted and money borrowed by a municipality without express authority or authority necessarily implied as being essential to carry into effect powers which are expressly granted. But in this instance we have the power expressly granted, (1) by the statutes of the State, (2) by the Federal law, and (3) by the city charter.

III. . We cannot blind ourselves to the fact that the construction of the proposed bridge would be but the establishment of a public highway between two cities. That public bridges are public highways or parts of public highways there can be no doubt. [5

Cyc. 1052, and cases cited; 4 Am. and Eng. Ency. of Law (2 Ed.), 920; Pembroke v. Railroad, 32 Mo. App. 61; Jordan v. City of Hannibal, 87 Mo. 673.]

The right to construct bridges over rivers and streams separating two cities or towns, by one or both of the municipalities concerned, has been recognized as a public city purpose. Nor is it any the less a city purpose because a part of the public highway is located beyond the city limits. In People ex rel. Murphy v. Kelly, 76 N. Y. 1. c. 487, 488 (the Brooklyn Bridge Case) EARL, J., said:

"Nor can it be said that the indebtedness authorized to be incurred by the cities for the construction of the bridge, was not for a city purpose. It is impossible to define in a general way with entire accuracy what a city purpose is, within the meaning of the Constitution. Each case must largely depend upon its own facts, and the meaning of these words must be evolved by a process of exclusion and inclusion in judicial construction. It would not be a city purpose for the city of New York to build a railroad from that city to Philadelphia, or to improve the navigation of the Hudson river generally, between that city and Albany, although incidental benefits might flow to the city. Such works have never been regarded as within the legitimate scope of municipal government. On the contrary, it would be a city purpose to purchase a supply of water outside of the city, and convey it to the city, and for such a purpose a city debt could be created. So lands for a park for the health and comfort of the inhabitants of a city could be purchased outside of the city limits, and yet conveniently near thereto. Such improvements are for the common and general benefit of all the citizens, and have always been regarded as within the scope of municipal government; and, so, too, highways or streets leading into a city or village may be improved, provided the improvements be confined

within such limits that they may be regarded as for the common benefit and enjoyment of all the citizens. It cannot, therefore, well be held, as claimed by the learned counsel for the appellants, that what is meant by a city purpose, is some work or expenditure within the city limits. There could be no good reason for such a limitation. It could be no worse for a city to incur debt for a city purpose outside of the city limits than for one within such limits, and there is just as much reason for allowing it to be incurred in the one case as in the other. The cities of New York and Brooklyn are intimately connected in many ways, by business, social and commercial ties. Thousands who do business in the one city, do business in the other. The port of New York includes the whole river at the place where the bridge is to be constructed, and the commerce from all parts of the world, which flows into that port, is discharged on each side of the river. To bridge such a water separating two such cities, must be a city purpose of each city. The bridge will be for the common benefit of all the citizens of both cities, and each citizen will have the same right to use it as every other citizen. It would have been a city purpose if either city had been authorized to build the whole of the bridge and it is no less so that both are to unite in building it."

To use the language of THAYER, Circuit Judge, in the case of South St. Paul v. Lamprecht Bros. Co., 88 Fed. 1. c. 454, "And the bridge so had in view was of as great advantage to the city as it would have been if located wholly within the corporate boundaries." In other words, if the surroundings show it to be a public municipal purpose, it is none the less so because a part of it by necessity must be located beyond the city limits, nor in our judgment is the character of the purpose changed because a portion must needs be located in another State. This question, however, we discuss later.

To a similar effect are the following cases: Matter of Mayor of New York, 99 N. Y. 569; Pittsburg v. Brace, 158 Pa. St. 174; Newman v. Ashe, 9 Baxt. (Tenn.) 380; Minnesota Land Co. v. Billings, 111 Fed. 972.

And our own court has fully recognized the right of the city of St. Louis, under charter provisions, not nearly so broad and liberal as the present ones, to acquire and hold property outside of the city limits for public municipal purposes. [Hafner v. St. Louis, 161 Mo. 34; Chambers v. St. Louis, 29 Mo. l. c. 575.]

So that in addition to the express statutory authority for the construction of the bridge, we conclude that the construction thereof is purely the exercise of a legitimate public municipal purpose, fully authorized by both statutory and charter provisions. In other words, that the city has the right to provide for the building of such a bridge as a legitimate public purpose, and as an authorized and proper public improvement. And this is true although a portion thereof must of necessity be beyond the corporate limits.

IV. Another contention is that the ordinances authorizing this debt and authorizing the issuance and sale of these bonds are violative of the following constitutional provisions:

"The General Assembly shall have no power to make any grant, or to authorize the making of any grant of public money or thing of value to any individual, association of individuals, municipal or other corporations whatsoever: Provided, that this shall not be so construed as to prevent the grant of aid in case of public calamity." [Sec. 46, art. 4, Missouri Constitution, 1875.]

"The General Assembly shall have no power to authorize any county, city or township or other political corporation or subdivision of the State now existing or that may be hereafter established, to lend its

credit, or to grant public money or thing of value in aid of or to any individual or corporation whatever, or to become a stockholder in such corporation.'' [Sec. 47, art. 4, Missouri Constitution, 1875.]

''No county, township, city or other municipality shall hereafter become a subscriber to the capital stock of any railroad or other corporation or association, or make appropriation or donation, or loan its credit to or in aid of any such corporation or association.'' [From sec. 6, art. 9, Missouri Constitution, 1875.]

These ordinances in no wise violate the constitutional provisions quoted. Under these ordinances not a dollar is given to any individual or corporation. No credit of the city is lent to any individual or corporation, nor by them has the city become a subscriber to the capital stock of any railroad or other corporation. On the other hand, the city is to be the absolute and sole owner of the proposed public improvement, and is to have the absolute and sole control and management thereof. Similar constitutional provisions in like cases have been discussed by the courts, and in practically every case the holdings are against the contentions of the plaintiffs. [Sun Printing & Pub. Assn. v. Mayor, etc., of New York, 152 N. Y. 257; Brooke v. Philadelphia, 162 Pa. St. 123; South St. Paul v. Lamprecht Bros. Co., 88 Fed. l. c. 454; Prince v. Crocker (Boston Subway Case), 166 Mass. 347; Walker v. Cincinnati, 21 Ohio St. l. c. 55, 56; Pleasant Township v. Ins. Co., 138 U. S. l. c. 74.]

It may be true that under the terms of the ordinances and the law, the city can grant to railway and street car corporations the right to use the public highway, so constructed, owned and controlled by it; but that does not change the ownership nor the control. Such is true of every highway controlled by the city. Such privileges can be granted, provided the public way is not seriously impaired for public use.

V. Another and further contention is that the city cannot make this needed public improvement because one end of the bridge and the approach or approaches thereto will be in the State of Illinois. As has been already noted, there is no question as to right of the city to construct a bridge, one portion of which shall be beyond its own corporate limits. Nor is there any question that for a proper public municipal purpose it may acquire and hold property beyond its own corporate limits. But the question here is, can it for this public purpose acquire and own land in Illinois and construct and maintain a public bridge over a navigable stream, one end of which must of necessity be in a foreign State? We think so. It is true that the Wisconsin court, in Becker v. City of La Crosse, 99 Wis. 414, has held to the contrary, but in such holding it is in express opposition to the holding in the case of Luxton v. North River Bridge Co., 153 U. S. 525. The statement of this latter case is short and is as follows:

"This was a petition by the North River Bridge Company, incorporated by the Act of Congress of July 11, 1890, c. 669, for the appointment under that act of commissioners to assess damages for the appropriation and condemnation, for the approaches to its bridge across the Hudson or North River, between the States of New York and New Jersey, of land of Sarah Luxton in the city of Hoboken and the county of Hudson in the latter State. Upon the order of the circuit court, appointing commissioners, she sued out a writ of error, which was dismissed by this court at the last term, because that order was not a final judgment. [147 U. S. 337.] The commissioners afterwards made an award and report, assessing her damages at the sum of two thousand dollars, to the acceptance of which she objected, upon the ground that the act of Congress was unconstitutional, and particularly that Congress could not confer the right of eminent domain upon

the company. But the court overruled the objection and adjudged that the award be approved and confirmed, and remain of record in the office of its clerk; and that, upon payment or tender of the sum awarded, the company might enter upon and take possession of the land for the purpose for which it was condemned. She thereupon sued out this writ of error.''

In this case Mr. Justice GRAY used this language: ''The Congress of the United States, being empowered by the Constitution to regulate commerce among the several States, and to pass all laws necessary or proper for carrying into execution any of the powers specifically conferred, may make use of any appropriate means for this end. As said by Chief Justice MARSHALL, 'The power of creating a corporation, though appertaining to sovereignty, is not, like the power of making war, or levying taxes, or of regulating commerce, a great substantive and independent power, which cannot be implied as incidental to other powers, or used as a means of executing them. It is never the end for which other powers are exercised, but a means by which other objects are accomplished.' Congress, therefore, may create corporations as appropriate means of executing the powers of government, as, for instance, a bank for the purpose of carrying on the fiscal operations of the United States, or a railroad corporation for the purpose of promoting commerce among the States. [McCulloch v. Maryland, 4 Wheat. 316, 411, 422; Osborn v. Bank of United States, 9 Wheat. 738, 861, 873; Pacific Railroad Removal Cases, 115 U. S. 1, 18; California v. Pacific Railroad, 127 U. S. 1, 39.] Congress has likewise the power, exercised early in this century by successive acts in the case of the Cumberland or National Road from the Potomac across the Alleghenies to the Ohio, to authorize the construction of a public highway connecting several States. [See Indiana v. United States,

148 U. S. 148.] And whenever it becomes necessary, for the accomplishment of any object within the authority of Congress, to exercise the right of eminent domain and take private lands, making just compensation to the owners, Congress may do this, with or without a concurrent act of the State in which the lands lie. [Van Brocklin v. Tennessee, 117 U. S. 151, 154, and cases cited; Cherokee Nation v. Kansas Railway, 135 U. S. 641, 656.]

"From these premises, the conclusion appears to be inevitable that, although Congress may, if it sees fit, and as it has often done, recognize and approve bridges erected by authority of two States across navigable waters between them, it may, at its discretion, use its sovereign powers, directly or through a corporation created for that object, to construct bridges for the accommodation of interstate commerce by land, as it undoubtedly may to improve the navigation of rivers for the convenience of interstate commerce by water. [1 Hare's Constitutional Law, 248, 249. See Acts of July 14, 1862, c. 167; 12 Stat. 569; February 17, 1865, c. 38; 13 Stat. 431; July 25, 1866, c. 246; 14 Stat. 244; March 3, 1871, c. 121, par. 5; 16 Stat. 572, 573; June 16, 1886, c. 417; 24 Stat. 78.]

"The judicial opinions cited in support of the opposite view are not, having regard to the facts of the cases in which they were uttered, of controlling weight."

In the case at bar the city of St. Louis, a corporation, has the charter and legal authority to construct this bridge in so far as the State of Missouri and its laws are concerned. It has the specific grant from the Federal Government, giving it the power to exercise the right of eminent domain, not only in Missouri, but in Illinois. If Congress can charter a corporation to build a bridge spanning from one State to another and clothe it with the power to condemn property in

either State, it certainly had the power to add this power by grant, to the powers already possessed by the city of St. Louis. In short, if Congress can create a corporation with such rights, it can grant such rights to one already in existence. Nor where the way provided for is a public way, for public purposes and public use, as in this case, can there be any distinction between granting such rights to a municipal corporation, rather than to a private corporation. The municipal corporation had the right to go beyond its corporate limits and acquire property for this public municipal purpose, and Congress simply says, that with our power over interstate commerce, by land as well as by water, you can extend or make your public highway over a navigable stream, and do what we can do, i. e., take private property therefor, compensating the owner as provided by law.

Under the views expressed by Justice GRAY, supra, it is not even necessary to obtain the consent of the State of Illinois. This view is sound in our judgment. The hauling of a wagon load of potatoes, grown in the valley of the Mississippi river in the State of Illinois, over the proposed public highway, from that State to the city of St. Louis, is just as much interstate commerce, as is the transportation of a train load of cattle from Texas to Chicago.

VI. It is next urged that, although the city can legally contract the debt, yet it cannot issue its negotiable bonds as evidence thereof. There is nothing in this contention. There is express authority in the Constitution for the issuance of such bonds: " . . . But said city shall be authorized at any time to issue bonds with the assent aforesaid, to an amount including the outstanding indebtedness other than that above named to the amount of five per cent of the value of the taxable property in said city, to be ascertained as above provided, and said city shall have power, with such

assent of the voters, to issue bonds for the construction and improvement of waterworks, the interest whereon and the principal whereof shall be provided for from the income of said waterworks. Said city shall establish a sinking fund for the payment of the bonds so authorized according to the time fixed for the maturity of the same." [Sec. 10, article 10, Mo. Constitution, as amended in 1902.] The quotation above has reference specifically to the city of St. Louis.

In paragraph first of section 26, of article 3, of the City Charter as amended June 23, 1903, is this provision: "The mayor and assembly shall have power within the city or by ordinance not inconsistent with the Constitution or any law of this State or of this charter. First, . . . to borrow money on the faith and credit of the city by the issue or sale of bonds or notes, for such amounts, and for such time, and for such purpose as may be required for current expenses . . . and for such other purposes as may be authorized by this charter or by the Constitution of this State in force at the time. . . . Negotiable bonds of the city in the form of coupon bonds or registered bonds, or both, or coupon bonds with the privilege of registration, may be issued from time to time within the limits prescribed by the Constitution of this State in force at the time for any one or more of the following purposes, to-wit."

Among these purposes, we have said above, is the construction of the bridge in question. And in addition the ordinances provide for the bonds and character thereof. So that we dismiss this matter without further notice.

VII. And lastly it is contended that the view of this court as expressed in the case of State ex rel. City of Chillicothe v. Wilder, State Auditor, 200 Mo. 97, is conclusive of the illegality of these proposed

205 Sup—44

bonds. They argue that, because the proposition submitted to the voters was, "For the construction and maintenance of a municipal bridge," the bonds fall under the ban of the Chillicothe case, supra. And this for the reason that the proposition provides for "the maintenance" as well as "the construction" of the bridge. There is a vast difference between the constitutional provisions involved in the two cases. The Chillicothe case is bottomed on section 12 of article 10, of the Constitution, reading thus: ". . . . That any city in this State containing not more than thirty thousand, nor less than two thousand inhabitants, may, with assent of two-thirds of the voters thereof, voting at an election to be held for that purpose, be allowed to become indebted in a larger amount than specified in section 12 of article 10 of the Constitution of this State, not exceeding an additonal five per cent of the value of the taxable property therein, for the purpose of purchasing or constructing waterworks or electric light plants to be owned exclusively by the city so purchasing or constructing the same."

Here, we have an express restriction as to the purpose for which the bonds could be issued, and this excluded the latter part of the proposition submitted to the voters of the city of Chillicothe. The proposition there submitted was: ". . . . For the purpose of erecting, constructing, and *maintaining and operating* a waterworks and electric light plant."

That case was well considered and well decided and we adhere to its doctrine. But that case is not this case by any manner or means. The constitutional provision involved in this case is from section 12, article 10, Missouri Constitution, as amended in 1902, and is as follows: ". . . .But said city shall be authorized at any time to issue bonds with the assent aforesaid, to an amount including the outstanding indebtedness other than that above named, to the amount

of five per cent of the value of the taxable property in said city, to be ascertained as above provided."

Here there is absolutely no restrictions as to the purpose, whilst in the Chillicothe case there was a specific restriction as to purpose for which bonds could be issued. The two cases are in no sense parallel. Of course, in all cases the debt for which the bonds are given must be for a legitimate and authorized city purpose, but can it be said that the maintenance of a public bridge, i. e., a public highway, for the travel and commerce of a large city, is not a legitimate and authorized purpose? We think not. But beyond this it is a public municipal purpose expressly granted by the Act of 1905, and made applicable to the city of St. Louis by virtue of section 6350 of our statutes, supra. These provisions did not apply in the Chillicothe case. Whilst by general law the city of Chillicothe was authorized to maintain, hold and operate a waterworks and electric light plant, yet there was a constitutional restriction as to what purpose its bonds of the city could be used. In the case of cities of the class of the city of St. Louis, there is no constitutional restriction as to the purpose for which the bonds are to be issued, except always that it and no other city can become indebted for anything other than a legitimate, authorized public municipal purpose. This saving exception is ingrafted by the wisdom of the law in an unbroken line of decisions from the earliest history of municipal legal lore. So that under the constitutional provision applicable to the city of St. Louis, the questions to be answered are (1) is the proposed bonded indebtedness submitted to the voters not in excess of five per cent of the assessed valuation, and (2) is the purpose for which it is to be incurred a legitimate, legal and authorized public municipal purpose? If these can be answered affirmatively, as in this case, the bond issue is legal and valid. Of course, in addition

to an affirmative answer to the questions, supra, there must appear regularity of proceedings throughout, all of which is apparent upon the record here.

We conclude, therefore, that the ruling in the Chillicothe case, supra, is in nowise controlling in this case, and that the judgment herein is correct and should be affirmed, and it is so ordered. *Lamm, J.,* concurs *in toto; Gantt, C. J.,* concurs in result and all the opinion except paragraph five, and as to this paragraph expresses no opinion; *Valliant* and *Fox, JJ.,* concur in the result and all of the opinion except paragraph five, and as to that they dissent; *Woodson, J.,* dissents; *Burgess, J.,* not being present at the argument, does not sit.