# SUPREME COURT

OF THE

# STATE OF COLORADO

---

APRIL and SEPTEMBER TERMS, 1914
and JANUARY TERM A. D. 1915

---

[No. 8300.]

LORD v. THE CITY AND COUNTY OF DENVER ET AL.

1. CONSTITUTIONAL LAW—*Municipal Corporations Contributing to Private Enterprise.*—On May 20th, A. D. 1913, the City and County of Denver adopted an amendment to their charter (§ 355); providing for the creation of a Tunnel Commission, with authority to construct or assist in the construction of a tunnel through the main range of the Rocky Mountains for the transportation of freight, passengers, water, and electricity, and with power to enter into contracts with individuals or corporations for the construction, control and management of the tunnel, and for the future lease, sale or disposition thereof; providing for the issue of bonds by the municipality in ¹$3,000,000 to assist in the expense, and for the annual levy of a tax sufficient for the creation of a sinking fund to discharge such bonds at maturity. Later the Tunnel Commission entered into a contract with a railway company for the construction and equipment of a tunnel, and its approaches, for railway transportation purposes, at the estimated cost of $4,500,000, and ready for the installation by the city of facilities for the transportation through the tunnel of water and electricity; the actual cost of the construction of the tunnel to be paid in the proportion of one-third by the railway company, and two-thirds by the

(1)

city; the railway company paying the annual interest on the bonds of the city, and the entire cost of maintenance, equipment and operation of the tunnel; that other railway companies might use the tunnel and its approaches upon certain terms set down in the contract; and finally for the sale of the tunnel by the city to the railway company, reserving the perpetual right to its use, for the transportation of water and electricity only.

Among other stipulations was a provision conferring upon the city the exclusive right, in perpetuity, to construct and operate, through the tunnel, an acqueduct or pipe-line etc. for conveying water for use by the City and its inhabitants, from the western to the eastern portal thereof, and the right to extend through the tunnel, cables, wires, and other apparatus, for conveying electricity to be used by the city, for power, light and other purposes.

On bill brought by a taxpayer, the amendment of the charter, and the contract pursuant thereto, were held clearly in violation of §§ 1 and 2 of Art. XI of the Constitution, (1) in pledging the credit of the city in aid of a private corporation, (2) in creating a partnership between the city and the railway company; that the reservations in favor of the city had not the effect to change the character of the proposed enterprise in this respect, or relieve it of its infirmities; (3) that the reservation to the city of the right to operate an acqueduct or pipe-line for conveying water from the western to the eastern portal of the tunnel was a mere easement, which the city had no means or right to enjoy, having no water or right to water to be so conveyed; (4) that the reservation of the right to bring electricity was without value, since the electrical current might be obtained elsewhere for a comparatively insignificant sum; (5) that the reservation of the city of the title to all mineral veins discovered was unlawful, in that the city has no power to tax its inhabitants to promote a prospecting contract; that what the reservation contemplated is not within municipal powers; (6) that the reservation to other companies of the right to enjoy the tunnel is within the constitutional prohibition, in that the city has no more power to extend its credit in aid of two or more railroads than one; and because further, the contract provides that the railroad company with which the contract was made should be entitled to exact from every other railway company, desiring to use the tunnel a yearly charge during the fifty years of the life of the contract for its own use, as a condition precedent. (14-33)

*Held* further, that the contract was invalidated by the provision for the sale of the tunnel by the city to the railway company; that it is not within the ordinary powers of a municipal corporation to construct an improvement, convenience, or necessity, with the avowed purpose to dispose of the same, or an interest therein, to a private person or corporation. *Denver v. Hallett*, 34 Colo. 393, distinguished. (34)

2. ——*Will of the People.*   Where a municipal corporation is proposing to enter into a contract prohibited by the Constitution, the fact that both the legal voters, and the tax payers of the community, have expressed themselves in unmistakable terms, in favor of the project, is of no moment.   (24)

And the express declaration in the charter amendment, that the project proposed "will be of local use and convenience to the public, and is essential to the future growth of the city" is equally to be disregarded.   (26)

3. ——*Article XX*—§ 1, contains no repeal of the limitation upon the powers of the municipal corporations prescribed by §§ 1 and 2 of Art. XI.   (26)

4.   CONTRACT—*Construed—Option*—An agreement by one party to sell, and the other to buy, a particular property for an agreed price is not an option but an executed contract.   (28)

*Error to Denver District Court.*—Hon. GEO. W. ALLEN, Judge.

Mr. HARRY S. SILVERSTEIN and Mr. HARRY L. LUBERS, for plaintiff in error.

Mr. I. N. STEVENS, City Attorney, and Mr. HARRY A. LINDSLEY, Mr. JOSEPH C. HELM and Mr. M. H. KENNEDY, of counsel for defendant in error.

Mr. JUSTICE SCOTT delivered the opinion of the court:

This action is by a citizen and taxpayer, to restrain the City and County of Denver from issuing its bonds in the amount of three millions of dollars, to aid in the construction of a proposed tunnel to be known as the "Moffat Tunnel." It seems that a statement of the facts must be extended to an unusual length in order that the matters to be determined may be properly understood.

The questions raised were determined in the court below upon a demurrer to the complaint. The complaint alleges the organization and existence of the City and County of Denver under the XXth article of the Constitution; and that on the 20th day of May, 1913, an amend-

ment to the charter of the city and county was adopted, known as section 355. This section purported to create a Tunnel Commission, to consist of three members, and at the same election, the members of such commission were elected. Among other things provided by the said amendment, were the following:

"All the powers granted to the City and County of Denver by Article XX of the Constitution of the State of Colorado, and otherwise existing by operation of law, including the power of eminent domain and authority to make all necessary filings under the laws of the State of Colorado and the United States, are hereby conferred upon said Tunnel Commission, to acquire, construct, build, assist in building and constructing, operate, maintain, lease and dispose of, a transportation tunnel, together with necessary approaches thereto, through the main range or divide of the Rocky Mountains under or near James Peak, to be known as the 'Moffat Tunnel,' for the purpose of transporting freight, passengers, water and electricity, or for any one or more of such purposes; *provided,* however, that in the event said tunnel shall be originally constructed for the transportation of freight and passengers, the right shall be retained by the City and County in perpetuity, to construct and operate, or to authorize the construction and operation, through such tunnel, of an aqueduct, pipe line or other apparatus for conveying water from the western to the eastern portal, for use by the City and County of Denver, and its inhabitants for domestic purposes, irrigation, power or other uses; also the right to extend or authorize the extension through the same, of cables, wires or other apparatus for conveying electricity manufactured west of the western portal thereof, to be used for power, lighting or other purposes, by the city and its inhabitants; and to permit the use thereof, upon some fair and equitable basis, by any and all railway lines desiring such use; but in enlarging said tunnel or otherwise preparing it for, and subjecting it to the said water or electric uses, the original use to which it shall have been subjected, shall not be destroyed, impaired or needlessly interrupted.

And if in constructing said tunnel, mineral in paying quantities shall be discovered therein, the commission shall have power to make such contracts and take such other steps in relation thereto as will secure for the city and county, the benefit of such discovery or discoveries.

"The construction, manägement, operation, lease and sale or disposition of said tunnel and its subjection to the transmission of water and electricity, shall be in the exclusive control of said Tunnel Commission, including the disbursement of all funds provided in connection therewith.

"The commission shall institute and defend all litigation affecting its duties or powers or arising from the exercise thereof, or in relation to its trusts, and all expenses of such litigation shall be paid by the treasurer, out of the General Fund upon the warrant of the commission.

"The commission may also provide that a portion of the funds needed for construction of the tunnel may be furnished by individuals or corporations interested in the same, and may enter into contracts with such individuals or corporations interested in the same, and may enter into contracts with such individuals or corporations with reference to the construction, control, management, operation and future lease, sale or disposition of the same; provided always, that until the city and county shall have been reimbursed in full for any and all moneys so expended by it, together with interest thereon, and is released from all financial liability in connection therewith, it shall retain the ownership of said tunnel and the right to regulate and control the same itself, or by its representative or agent, or by contract as hereinbefore provided.

"And *provided* further, that the rights in and to said tunnel hereinbefore reserved to the city and county in perpetuity, shall be perpetually retained, notwithstanding any lease, sale or other disposition of said tunnel or its use. If upon investigation the commission shall decide that said tunnel is desirable and its construction feasible, that body shall determine the amount of general bonds of the city

and county necessary to be issued, and the rate of interest the same shall bear per annum; and the commission may by ordinance of the city council, submit to the vote of the taxpaying electors, at any time, at any election held in the city and county, after the adoption of this amendment, for whatever purpose such election may be called, whether such election be general or special, or at a special election called upon their request for the purpose, the question of whether the city and county shall issue its general bonds maturing in not less than fifteen, nor more than fifty years for such purpose, in such amount, and at such rate of interest as has been determined by said commission; and the council shall pass the necessary ordinance to call said election at the time so fixed by said commission, and the Clerk and Election Commission shall publish the necessary notices for calling and holding said election at the time so fixed, and they and all other officers, shall perform the duties incumbent upon them by law for the legal holding of said election.

"The commission may also submit any proposition concerning its powers or trust at any municipal election. All propositions shall be submitted in the way, at the time, and in the manner and form prescribed by said commission.

"When there is so submitted to the taxpaying electors the question of incurring a general indebtedness of the city and county, for the foregoing purpose, if a majority of the votes cast thereon shall be in favor of the proposition so submitted, it shall thereby be adopted, and such adoption shall be a sufficient authorization for the issuance of the bonds in the amount thereby provided for, and maturing on the date therein fixed, and the same, when issued, shall be and constitute a valid general indebtedness of the City and County of Denver for said purpose, and the provisions of this section relative to the issue, sale and redemption of bonds, shall apply thereto; the vote upon such election shall be canvassed and the result declared by the proper officers as provided by law.

"The council shall pass such ordinance as said commission shall deem necessary respecting the issuance of said bonds, or to the full exercise of all the powers herein given it, in the form recommended by the commission and without amendment, and the Mayor shall sign the same.

"The City and County of Denver shall annually levy a sufficient tax for the creation of a sinking fund to discharge in full the principal of, and interest on, the bonds issued hereunder, unless the ordinance adopted, as hereinabove provided, shall contain suitable provisions otherwise to insure the prompt payment of said interest as the same shall become due, and also for the creation of a sinking fund sufficient to discharge in full the principal of said bonds at maturity.

"This section and any provision of the charter referred to herein shall remain in full force, so far as may be necessary for the purpose of securing the prompt payment of the bonds issued hereunder, and until said bonds are fully paid shall be irrepealable.

"The inhabitants of the City and County of Denver by the adoption of this charter amendment do find and declare that the said tunnel, will in their judgment, be of local use and convenience to the people, and that it is also absolutely essential to the future growth and welfare of said city and county."

It is then alleged that the tunnel commission so created, proceeded to determine and did determine, the approximate cost of the tunnel, together with the necessary approaches thereto, through the main range or divide of the Rocky Mountains, under or near James Peak, and for that purpose the same could be constructed for not to exceed $4,420,000, and that acting under the authority assumed to be conferred, by the city charter amendment, the commission on the 8th day of October, 1913, entered into a written agreement with the Denver and Salt Lake Railroad Company, for the construction of such tunnel.

This agreement recites that the railroad company owns and operates a railroad from the City of Denver

to Steamboat Springs, Colorado, and is engaged in the extension thereof to Craig, Colorado, and shall be further constructed and extended to Salt Lake City, Utah; that the railroad company desires to use, lease, operate and maintain and ultimately to acquire, the said tunnel, for railroad and transportation purposes, subject to the city's use for conveying water and electricity, and the city's power and control over said tunnel for the purpose of assuring fair and equitable rates to other railroads using said tunnel; and that in consideration of the premises, the railroad company is willing to grant the use of its tracks for the distance of thirty miles east of the eastern portal of said tunnel, and for a distance of seventy-five miles west of the western portal of said tunnel in perpetuity, to other railroads desiring to use the tunnel, on the terms and conditions afterwards provided in the agreement; that a survey has theretofore been made by the Continental Tunnel Railroad Company, and rights of way have been secured by said company, in the land office of the United States for the location of the proposed tunnel.

It is then agreed that in pursuance of the power conferred by the said charter amendment, the tunnel commission will procure the services of engineers of experience, in the construction of the proposed tunnel, and fix the compensation to be paid such engineers, and that this payment shall be made from the funds provided for the construction of the tunnel; or in case of failure of the city to vote the bonds provided in the agreement, that the railroad company shall pay one-third, and the tunnel commission two-thirds of said expenses; that an estimate of the costs of the tunnel shall be made by the engineers, and which tunnel shall be adapted for and with a single-track railroad, having an inside clearance of not less than sixteen feet in width, and not less than twenty-one feet in height, and suitable for said city's use not only for railroad transportation purposes, but also for the conveyance of an ample supply of water for domestic and irrigation purposes, and electricity for power and

lighting purposes for the City and County of Denver, and the inhabitants thereof, and which said tunnel shall have grades not exceeding two per cent cut for railroad purposes.

The tunnel commission further agreed, that in case the engineers report the probable cost of construction of the tunnel and the approaches, ready for the installation of facilities for the transportation of water and electricity for use by the City and County of Denver, and ready for the electric operation of a single-track railroad, shall be $4,500,000 or less, then the tunnel commission shall undertake the construction, building and completion of said tunnel, approaches and stationary railroad facilities, and provide and pay $3,000,000 by and through the issuance of general bonds of the City and County of Denver, to be issued in accordance with the amendment; such bonds to bear interest at not more than five per cent per annum, interest payable semi-annually, and shall be payable fifty years after their date.

It was also provided for the retirement of such bonds and the creation of a sinking fund. It was then agreed by the commission that if the probable cost reported by the engineers did not exceed $4,500,000 and if the lowest satisfactory bid confirms such estimate, that the tunnel commission shall build said tunnel upon conditions that the railroad company shall pay the entire excess of costs over and above the sum of $3,000,000; further, that the payments required by the railroad company shall be deposited as thereafter agreed, and that the consideration of such payments, together with the right to use the tracks of said railroad company, are for an option provided for in the agreement, by which the railroad company is granted the right to use, lease, operate, and maintain, and ultimately to acquire the said tunnel from said tunnel commission, as provided in the agreement. The tunnel commission was to institute and defend all litigation affecting its duties and powers, or arising from the exercise thereof, or relating to the administration of its trusts, and to exercise the power of

eminent domain, and all of the expenses therein incurred, are to be included as a part of the costs of the tunnel.

The tunnel commission further agreed that the railroad company may at any time purchase said tunnel for railroad transportation purposes, upon the payment by the railroad company, of the $3,000,000 of the bonds provided for, or so much thereof as may be sold for the purposes thereof, with all accrued interest, and that the title of the said tunnel and its approaches, shall thereupon immediately vest in the railroad company. The tunnel commission is, on demand of the railroad company, to execute and deliver to the railroad company, such other and further assurance of title as may be necessary in the premises; subject, however, to a perpetual easement in the city for the transmission of water, and electric current for light, heat and power, and also subject to the perpetual right reserved by the city and county, to have said tunnel equipment and approaches, and tracks of said railroad for a distance of thirty miles east of the eastern portal and for a distance of seventy-five miles west of the western portal, used by other railroads, as provided in the agreement.

The railroad company agreed that if the estimate of the engineers for the reasonable cost of said tunnel, necessary approaches and stationary railroad facilities, ready for laying of pipes and the installation of facilities for the transportation of an ample supply of water for domestic and irrigation uses, and of electricity for power and lighting purposes, for the City and County of Denver, and including said single-track railroad, to be $4,500,000 or less, then one-third of said estimate costs of construction, building and completion of said tunnel, approaches and facilities shall be deposited by said railroad company, concurrently with the two-thirds thereof deposited by the tunnel commission.

The railroad company further agreed that the tunnel commission should build and construct the tunnel, necessary approaches thereto, and facilities for trans-

portation of water and electricity as aforesaid, including said single-track, and that the railroad company should pay any excess of cost above the said sum of $3,000,000.

It was also agreed that the title to the said tunnel and its necessary approaches, shall be vested in the City and County of Denver, and shall remain the property of said city and county, until the same shall have been purchased and fully paid for by the railroad company.

It was further agreed that the railroad company should pay the interest on all the bonds to be issued and sold by the city, so long as any such bonds are unpaid and outstanding, plus one per cent per annum on all said bonds outstanding, to comply with the sinking fund for the provision of the retirement of said bonds, and should also pay the entire cost of maintenance, equipment and operation of said tunnel, including the necessary motive power.

The railroad company further agreed to provide trackage rights for the use of said tunnel and its approaches by other railroads under 'fair and reasonable trackage agreements containing the usual proper covenants and conditions customarily embodied in trackage agreements between railroads, and upon condition that each other railroad desiring to use the said tunnel and its approaches, may do so only upon payment of one-half of the interest upon the actual cost of construction and equipment of the tunnel, and its approaches, on a basis of five per cent of all sums paid by the constructing parties, for construction and equipment and motive power of said tunnel and its approaches, together with such proportion of the cost of maintenance and operation of said tunnel and its approaches, as the number of car wheels of each road so using said tunnel, shall bear to the total number of car wheels passing through said tunnel.

The railroad company further agreed to furnish at its own cost, and to provide all electric current necessary for the operation of the tunnel and its approaches, and to supply all the necessary equipment, including mo-

tive power, for the operation of the tunnel. The railroad company further agreed to permit to the railroads having trackage rights to the use of the tunnel, to use its tracks and facilities for a distance of thirty miles from the east portal, and seventy-five miles from the west portal, *provided* that any such railroad so using the tracks and facilities, shall pay interest at the rate of three per cent per annum based upon the reasonable cost of reproducing the tracks so used, at the time of acquiring the right of way, and that each railroad shall in addition, and as a condition precedent, pay to the railroad company for maintenance and repairs, a percentage of the actual cost thereof based upon the car wheels estimate. The railroad company further agreed that it would on or before the maturity of the bonds of the city, exercise its option to purchase said tunnel by the payment of the principal of the $3,000,000, or so much thereof as may have been sold.

It is further agreed by the railroad company, that it will immediately, upon the beginning of the construction of the tunnel, proceed in the construction of its lines from Craig, Colorado, toward the Colorado and Utah line, and will within five years from the date of the completion of the tunnel, have its lines fully and continuously in regular, daily operation to the City of Salt Lake.

It was also agreed between the parties, that before any contract is let for the construction of the tunnel or any part thereof, the tunnel commission shall deposit with a depository to be agreed upon, $3,000,000 of bonds of the City and County of Denver, and that the railroad company will deposit with the said depository, its proportion of the total cost of the said tunnel in cash or current marketable securities so deposited, to be sold by the party so depositing as it may desire, and all proceeds to be deposited with the depository.

It was mutually agreed further, that the money so deposited by the contracting parties shall be paid out in the same ratio or proportion, as the total amount furnished by the parties shall bear to each other.

It was further mutually agreed that the exclusive right shall forever be reserved in perpetuity in the City and County of Denver, "to construct and operate through said tunnel, an aqueduct, pipe line, or other apparatus for conveying water from the western to the eastern portal, for use by the said City and County of Denver, for domestic, power, and other purposes, also the right to extend through the same, cables, wires and other apparatus for conveying electricity, to be used for power, light and other purposes by the city; subject to the conditions that all installation of equipment and use of said tunnel and approaches for the purposes aforesaid, shall not destroy, impair, or unreasonably interrupt the uses of said tunnel for said railroad purposes."

It was further agreed that the tunnel commission shall take such steps as may be permissible under the existing laws, or by procuring appropriate legislation, as will secure exclusively to the city, the benefit of any or all veins of mineral, or mineral deposits, that may be discovered in constructing the tunnel, provided that no mining operations or mining development shall, at any time or in any manner, interfere with, impede, endanger, or destroy the use of said tunnel or its approaches for transportation purposes. All funds were to be paid out upon order of the tunnel commission. Contracts were to be let by bid, the tunnel commission to reserve the right to accept or reject any such bids.

It was also provided, that upon completion of the tunnel and its approaches, the railroad company should be entitled to the possession and operation of the same for railroad transportation purposes, such possession and operation being subject to the use, rights and easements reserved to the city.

It was further agreed that the cost of the special election to determine the question of issuance of the $3,000,000 bond issue, shall be paid, one-half by the city, and one-half by the railroad company. It was likewise provided that in case of failure of the railroad to pay the interest on the outstanding bonds of the city, or to

deposit the one per cent sinking fund as provided, or failure in any other of the material provisions of the contract for a period of three months, then the tunnel commission may declare the contract terminated and all sums paid by the railroad company shall be held as liquidated damages.

The complaint further alleges that after the execution of this agreement the question of the issuance of $3,000,000 in bonds, was properly submitted and adopted.

There are but two questions presented for determination: 1. Is the issuance of the bonds by the city and for such a purpose, inhibited by the constitution; 2. If not, then is the provision of the contract and proposition to issue such bonds extended for the full period of fifty years, in contravention of sec. 8, art. XI of the Constitution limiting the period for the extinguishment of a city debt to fifteen years.

Sections 1 and 2 of art. XI of the Constitution provide:

"Sec. 1. Neither the state nor any county, city, town, township or school district, shall lend or pledge the credit or faith thereof, directly or indirectly, in any manner to, or in aid of any person, company or corporation, public or private, for any amount or for any purpose whatever, or become responsible for any debt, contract or liability of any person, company or corporation, public or private, in or out of the state.

"Sec. 2. Neither the state nor any county, city, town, township or school district, shall make any donation or grant to, or in aid of, or become a subscriber to, or shareholder in, any corporation or company, or a joint owner with any person, company or corporation, public or private, in or out of the state, except as to such ownership as may accrue to the state, by escheat or by forfeiture, by operation or provision of law; and except as to such ownership as may accrue to the state, or to any county, city, town, township or school district, or to either or any of them, jointly with any person, company or corporation, by forfeiture or sale of real

estate for non-payment of taxes, or by donation or devise for public use, or by purchase by or on behalf of any or either of them, jointly with any or either of them, under execution in cases of fines, penalties or forfeiture of recognizance, breach of condition of official bonds, or of bond to secure public moneys, or the performance of any contract in which they or any of them may be jointly or severally interested.''

Prior to the adoption of our constitution, the policy of extending public aid to private corporations, had grown to be alarming. Judge Dillon in his work on Municipal Corporations, 1 Dill. § 313 and 318, points out the evil effects arising therefrom. This policy he suggests had become a mania, particularly in the west; that it had resulted in attempted repudiation upon the part of both states and municipalities, and says:

"The most noted of extraordinary or extra-municipal powers conferred upon municipal and public corporations, is the authority to aid in the construction of railways by subscribing to their stock, issuing negotiable bonds as a means of paying their subscription, and taxing the inhabitants or the property within their limits to pay the indebtedness thereby incurred   *   *   *   regarded in the light of its effects, whatever may be thought of its constitutional soundness, there is little hesitation in affirming that this invention to aid the enterprise of private corporations has proved itself baneful in the last degree.''

To prevent this evil, there began the adoption of constitutional amendments by many of the states, denying the right of the legislature to grant such powers. Our constitution was adopted at a time when the subject was much in the public mind. An examination of the proceedings of the constitutional convention shows the introduction of several resolutions upon the subject, and repeated re-drafts of these sections, with the result that sections 1 and 2 of art. XI are broader in scope, and more specific in the matter of restriction, than any similar constitutional provision considered or brought to

our attention. Indeed, it would seem that language could not make plainer the intent of the framers of the constitution, to utterly prohibit the mingling of public moneys with those of private persons, either directly or indirectly, or in any manner whatsoever.

These sections of the constitution have been before this court, for interpretation at least, as to the spirit and intent. The case of *C. C. R. R. Co. v. Lea,* 5 Colo. 192, was decided within a very short period after the adoption of the constitution. Two of the three judges, then constituting the Supreme Court, had served as members of the constitutional convention. The question of public benefit was urged in that case, as here. It was there said:

"That the construction of the proposed line of railroad would be of great benefit to the county and its citizens; that it would give them increased and superior facilities for traffic and commerce with both the Atlantic and Pacific seaboards, do not make it any the less a donation within the intent of the inhibition.

"These and similar considerations of public benefit and advantage, had constituted for years, under our territorial government, the basis of appeals for and grants of county and municipal aid to railroad companies, and it was undoubtedly the intention of the framers of the Constitution, whether wisely or not, to prohibit, by the fundamental law of the new State, all public aid to railroad companies, whether by donation, grant or subscription, no matter what might be the public benefit and advantages flowing from the construction of such roads. I understand the framers of the Constitution and the people who adopted it, to have intended by this provision the declaration of a broad policy of prohibition, forbidding state, county and municipal aid to railroad and other companies in any of the modes specified.

"If the existence of a public benefit is to give such an agreement, the character of a sale of the stock, and take it out of the constitutional prohibition, then the prohibition is utterly nugatory and

valueless, as such consideration would exist in every probable case.''

Speaking of the sections of the Constitution under consideration and other provisions in restriction of authority to incur public debt, in the case of *People ex rel. v. May,* 9 Colo. 80, 10 Pac. 641, it was said:

> "It was their duty not only to provide against the recurrence of evils, patent and already experienced, but also to guard every point where abuses were liable to creep into the administration of public affairs. The waste, extravagance, frauds, peculations, defalcations and tax burdens, disgracing and incumbering the administration of American municipalities, county, town and city, had long been national topics of discussion, written about by publicists, denounced by the press and resolved about by political parties, and were known to the country at large. The effect of this was to make the honest and economical adminstration of affairs, whether town, city, county or state, practically the most important question that came before the convention."

It may be well to consider briefly the material facts as presented by the record. The railroad company owns and operates a railroad, beginning in the City of Denver and extending westward and over and beyond the range of mountains, through which the tunnel is proposed to be constructed. The agreement is in effect that the city will issue and sell its bonds in payment of two-thirds of the expense of the construction of such tunnel and its approaches, and to provide the same with railroad tracks for the operation of the company's trains through said tunnel. The railroad company to contribute one-third of the expense of such tunnel. The city is to sell, and the railroad to purchase, the city's interest in the tunnel upon payment to the city of the amount invested, with interest, within a specified time, and in the meantime to use the same as a part of its railroad line, and to pay the interest on the city's bonds.

The city has not projected, provided for, nor has it declared its intention to build, construct, own or operate

a water system, power plant, or any other public utility, of which the tunnel is to form a component part, or in which it is to be of any use to the city whatsoever.

Stripped of non-essentials for consideration here, and of improbable contingencies and remote possibilities, the foregoing statement presents the gist or rather the meat of the agreement between the city and the railroad company:

The railroad company operates its line over the mountains. It is important, and may be necessary for it to reduce its grade by going through the mountain by means of a tunnel. The city agrees with it, to issue its bonds in payment of two-thirds of the expense of driving the tunnel, constructing the railroad tracks, and proper approaches with the other necessary equipment to enable the railroad company to connect with its tracks at both ends of the tunnel. For this the company agrees to pay the interest on the bonds, and finally the principal, and upon such payment is to receive full title to the tunnel as constructed, for its purposes. Plainly this is in violation of the constitutional provisions, in that the city pledges its faith and credit for the benefit and use of the railroad corporation, and as plainly this is in aid of the railroad corporation.

It is likewise just as clear that this constitutes a joint enterprise between the city and the company, to last until the company shall have purchased the city's interests. By every legal test it is a partnership.

Do the other provisions of the agreement relieve it from this limitation of power.

Counsel for the defendants in error assert that there are four reservations in the contract that take it out of the inhibition of the constitution. We will consider these in the order and in the exact language presented:

"1. The perpetual right to use the tunnel free of rental or charge, as an aqueduct, and to install conduits therein for the purpose of bringing water from the western slope to be used by the city and its inhabitants."

The agreement specifically provides that all the money contributed by the city shall be expended in the construction and equipment of the tunnel for railroad purposes alone.   Not a dollar of this fund is to be used to install conduits or other means for the purpose of bringing water from the western slope to be used by the city and its inhabitants.

The engineers were to report the probable cost of the tunnel ready for the installation of facilities for the transportation of water and electricity for use by the City and County of Denver, and ready for the electrical operation of a single-track railroad, and for the building and completion of said tunnel, approaches, and railroad, and stationary railroad facilities.

The tunnel is thus to be ready only for the installation of city facilities, but is to be fully equipped for the purpose of railroad operation by the company, including the approaches and tracks.   In another part of the agreement it is said the tunnel is to be "ready for the laying of pipes" by the city.

In the agreement, the rights of the city are specifically referred to as "easements."   The agreement specifically provides, not for construction for the city's use, but the right only to the city of an easement.

"To construct and operate through said tunnel, an aqueduct, pipe line, or other apparatus for conveying water from the western to the eastern portal for use by the said City and County of Denver, for domestic, power, and other purposes, also the right to extend through the same, cables, wires and other apparatus for conveying electricity, to be used for power, light and other purposes by the city; subject to the conditions that all installation of equipment and use of said tunnel and approaches for the purposes aforesaid, shall not destroy, impair, or unreasonably interrupt the uses of said tunnel for said railroad purposes."

Counsel for the city in their brief say:

"For drainage and other purposes, it is necessary to have the center of the Moffat Tunnel slightly

higher than either portal; and, as a matter of fact, the western portal of the tunnel, as now proposed, will be fifty or sixty feet lower than the eastern portal. These facts have given rise to a doubt in the minds of many intelligent people as to the ability of the city to bring water through the tunnel from the western slope. This doubt does, not, however, exist in the minds of educated engineers. It arises through a want of knowledge and experience on the part of the ordinary, though educated and intelligent laymen. In reality, the circumstances detailed present no difficulty whatever. By employment of what may be termed the 'inverted siphon' principle, all difficulty is overcome.''

They also submit a drawing showing a vertical section of the mountain, the line of the proposed tunnel, the portals, and the line of level, and argue that the conveyance of water through the tunnel after its construction for railroad purposes, is an engineering possibility.

But this is not intended or suggested as a part of the agreement under which the city is to spend its money, to obtain which it must levy a tax upon its citizens.

Besides this, it is conceded that the city has no rights to the use of water west of the proposed tunnel, or that it has declared a purpose to acquire any such right, or has any intention to so do, or that it has a purpose to convey water through such tunnel, or by any other means, for the use of its inhabitants or otherwise, or that it has a purpose to attempt to convert such an engineering possibility into an accomplished fact. Indeed, under the express provision of the charter amendment the purpose of the tunnel is not necessarily for the conduct of water or electricity, but for any one of four purposes, for it recites, ''for the purpose of transporting freight, passengers, water and electricity, or for any one or more of such purposes.'' And the amendment again recites: ''But in enlarging said tunnel or otherwise preparing it for, and, subjecting it to, the said water or electric uses, the original use to which it shall have been subjected, shall not be impaired or needlessly inter-

rupted." The "original use" can be none other than for railroad transportation purposes, and by the Denver and Salt Lake road.

The second reservation to the city, relied on by counsel to sustain their contentions is as follows:

> "2. The perpetual right, free of rental or charge, to install wires, together with all other apparatus that may be necessary, and bring electricity through the tunnel for lighting and power and other uses by the city and its inhabitants."

What has been said concerning the first proposition applies with equal force to this one, which deals with the possible transmission of electric current. Clearly the record discloses no intent or purpose upon the part of the city, to acquire power for the generation of electricity at a point beyond the tunnel or at any other point, or to engage in the generation and distribution of electricity for any municipal or other purpose.

And if it did so intend, certainly it would not undertake the construction of a tunnel at an expense to the city, of three millions of dollars, in the face of the common knowledge that electric current may be as easily conveyed over the mountains as through a tunnel, and at a comparatively insignificant expense.

The third reservation in the agreement, cited by counsel and upon which reliance is had, is:

> "3. The ownership of mineral veins discovered in constructing the tunnel, and the perpetual right, free of charge, to locate the same and mine the ore therein; provided the city acquires the legal right to such veins; and provided also that such mining shall not interfere with, impede, endanger, or destroy the use of the tunnel for transportation purposes."

Certainly it will not be seriously contended that a municipality as such, can have the lawful right to levy a tax upon its citizens, in the absence of specific constitutional authority, for the purpose of locating mining claims, and engaging in the mining of metalliferous ores.

If it may do so in Grand and Gilpin counties, it may

with equal right and more propriety, so engage in the well known mining districts of Cripple Creek, Telluride or Leadville. We know of no authority wherein it has even been suggested that such a business comes within the range of municipal purposes. Besides, the discovery of valuable ores in the proposed tunnel can be said to be nothing more than a very remote possibility, and it will hardly be said that prospecting for ores, is a municipal power. But by what right may the city and the railroad company contract as to the ownership of ores located upon premises to which neither of the contracting parties have any right, title or interest.

The fourth and last proposition upon which counsel rely is the following:

"4. The perpetual right to subject the tunnel and the railway tracks therein to use by any other railroad desiring such use, including outside trackage rights over the line of said Denver & Salt Lake Railroad for such other railroads, covering a distance of seventy-five miles westerly from the western portal of the tunnel and thirty miles easterly from its eastern portal; such use of the tunnel and trackage rights to be upon reasonable terms to the other railroads so using the same; said terms being already specified in the written contract of October 8th, 1913, between the city and the railroad company."

If it is within the constitutional prohibition for the city to make donation, or grant to, or in aid of one railroad; or to lend or pledge its faith or credit, in aid of one railroad, or to become a joint owner with one railroad, clearly it is within such prohibition to so do with two or more railroads.

This proposition is but a repeated offense against the constitution. It involves another and only a possible contingency. It does not appear that any other railroad company desires or ever will desire, to avail itself of any such privilege, if it be a privilege. And if so, then under the agreement, it must be by a future contract with the Denver & Salt Lake Railroad Company

alone, and upon terms dictated by that corporation. Such agreements are to be the usual trackage agreements between railroads, in addition to other specific charges. It is true that in general the basis of the terms of such contracts are set out in the contract between the city, and the Denver & Salt Lake Company, but the latter company is to avail itself of all financial benefit. For instance it is provided that each railroad so using the tunnel, must pay one-half of the interest upon the actual cost of construction and equipment of the tunnel and its approaches, on the basis of five per cent of the cost both to the city and the Denver & Salt Lake Company, including motive power, and the proportionate cost of maintenance.

Thus, if four of the great railroad companies, whose lines now enter the City of Denver, and some of which now extend both east and west of the city, with connections extending to both seaboards, should conclude that the use of the proposed tunnel would be of benefit to them in making shorter through routes, or for other reasons, and if the city should conclude that this would be of material commercial advantage to it, an object apparently much desired by the citizens of Denver, then under this provision of the contract, the Denver & Salt Lake Railroad Company is empowered to charge each of such roads $112,500 annually, under the fictitious item of interest, in addition to the usual trackage agreements and other fixed charges provided by the agreement now being considered.

Not because there would be any such interest to pay, for the interest provided for would in the case suggested, amount to but one-half of what these four railroads alone must pay. Upon the estimated cost of construction at $4,500,000, and of five per cent as the rate of interest, these four roads would pay as an annual arbitrary and indefeasible sum, not to the city, but to the Denver & Salt Lake Railroad Company, of $450,000. This right is thus given to that railroad company in perpetuity.

Thus, during the life of the proposed bonds alone, fifty years, each road so to use the tunnel, must first agree to pay to the Denver & Salt Lake Railroad Company, the sum of $5,625,000 for the use and benefit of that company. And this same right is given to the railroad company, to so tax every additional railroad that may desire to use the tunnel.

Certainly such manifest inequality and injustice, both to the city and to other companies, cannot act as an inducement for such companies to make use of the tunnel. Indeed, it would seem to present such a serious obstacle to the accomplishment of such purpose, as may be absolutely prohibitive. In this feature alone the contract between the city and the Salt Lake Company, if not a grant of subsidy, is infinitely worse, for it confers the power upon the Salt Lake Company to levy tribute upon every other railroad company that may desire to make use of the tunnel. This is a flagrant violation of the constitutional provision.

From our consideration of these provisions inserted in the contract, we are irresistibly forced to the conclusion that they were inserted, not for the accomplishment of a legitimate municipal purpose, but rather in an effort to evade the constitutional prohibition.

Counsel urge that the question here is one for legislative determination, and point out that by elections, both by the voters and tax payers separately expressed, the legislative will of the municipality has been manifested in terms not to be mistaken. This manifestation of the will of the people of the municipality has been constantly before us in the consideration of the case.

But the question we are now considering is not one of the will of the municipality, but is solely a question of limitation of power. We have not overlooked the rule of construction adopted by this court in an opinion written by the late Chief Justice Steele, in the case of *Denver v. Hallett*, 34 Colo. 398, 83 Pac. 1068, but rather to reiterate and emphasize it. It was there said:

"In a number of cases before this court as well

as the court of appeals, it has been held that with respect to municipal corporations, except as limited by the constitution, the general assembly has plenary power; that it is clearly a legislative function to determine what power shall be granted, what withheld, and what restrictions shall be imposed in the exercise of the powers granted.  *  *  *  The supremacy of the legislative authority over municipal corporations is not, however, in all respects unlimited, but the limitation must be sought in the national or state constitution.''

It will certainly not be contended that either by the legislature of the state, or by the legislative powers of a municipality, such powers as are expressly prohibited by the organic law, may be exercised by either. Ours is a constitutional government, wherein the sovereign will of all the people, as expressed in the constitution, is supreme, beyond the express limitations of which a municipality may not go. If the municipality may offend, then so may the individual. If this may be done in case of the levy of a prohibited tax, it follows that it may be done in a case involving life or liberty; the Bill of Rights is then no protection, and the constitution becomes a rope of sand.

It is said that under the provisions of sec. 1, art. 20, there is the implied power to do that which is attempted in this case. The provision relied on is:

''The municipal corporation known as the City of Denver, etc., shall have the power, within or without its territorial limits, to construct, condemn, and purchase, acquire, lease, add to, maintain, conduct and operate, waterworks, light plants, power plants, transportation systems, heating plants, and any other public utilities or works or ways local in use and extent, in whole or in part, and everything required therefor, for the use of said city and county and the inhabitants thereof, and any such systems, plants or works or ways, or any contracts in relation or connection with either, that may exist and which said city and county may desire to purchase, in whole or in part, the same or any part thereof may

be purchased by said city and county which may enforce such purchase by proceedings at law as in taking land for public use by right of eminent domain, and shall have the power to issue bonds upon the vote of the taxpaying electors, at any special or general election, in any amount necessary to carry out any of said powers or purposes, as may by the charter be provided.''

Nowhere in sec. 1, art. 20 can there be found express alteration or limit of the prohibition contained in secs. 1 and 2 of art. XI, and all municipalities operating under the 20th art. are clearly subject to such limitations.

It is said in 1 Dill. Mun. Corp. 399, and heretofore approved by this court:

"It is a general and understood proposition of law that a municipal corporation possesses and can exercise the following powers and no others: First, those granted in express words; Second, those necessarily or fairly implied in, or incident to, the powers expressly granted; Third, those essential to the declared objects and purposes of the corporation—not simply convenient, but indispensable. Any fair, reasonable doubt concerning the existence of power is resolved by the court against the corporation, and the power is denied. Of every municipal corporation the charter or statute by which it is created, is its organic act. Neither the corporation nor its officers can do any act or make any contract or incur any liability not authorized thereby. All acts beyond the scope of the powers granted are void.''

From what has been said, it is clear that the declaration in the amendment to the charter, sec. 355, to the effect that the tunnel will be of local use, and convenience to the public, and is essential to the future growth and welfare of the city and county, cannot prevail as against an express constitutional prohibition of the power therein attempted to be exercised.

*Higgins v. San Diego Water Co.*, 118 Cal. 537, 50 Pac. 674, was a case where there was an attempt to violate constitutional limitations similar to ours.

In that case a flume company was the owner of a

water supply and system of pipes by which it brought water to the city limits. A water company had pipes and all necessary facilities for distributing water to consumers throughout the city. These two companies entered into an agreement constituting the water company sole agent for the flume company for the sale of its water to the city. The entire distributing plant was then turned over to the city. This was in form of a lease to five citizens of the city, who in turn granted a sub-lease to the city. One of the considerations of the lease was that the water company should cause a railroad to be constructed from the City of San Diego to a point in Mexico. The court held:

"That these reasons, and for these alone, the contract was held invalid by the learned judge of the Superior Court. As to the other objection above stated he says in the opinion referred to: 'While it is very evident from the terms of the contract that the hope that a railroad would be constructed was one of the moving causes for the city authorities entering into the contract, it was not in my opinion a consideration of the contract, but merely a condition subsequent which falls because invalid, without affecting the other provisions of the contract.' And in his conclusions of law he holds: 'That said lease and sublease were not void because the amount agreed to be paid was a subsidy to or in aid of the construction of a railroad.' These conclusions are based upon findings to the effect that the city waived the construction of the railroad, and that neither the city nor its mayor acting in its behalf, was induced to enter into the contract by any promises or representations of the officers or agents of the water company that the railroad would be built."

And again the Supreme Court said: "The result of the foregoing discussion is that the contract of the city with water company is held invalid upon at least two grounds: 1. Because the city was led by the contrivance of the water company to agree to pay, under the name of rent, a subsidy to a railroad; and, 2. Because the mayor had not sufficient authority to execute it on the part of the city."

Counsel for the city cites many cases upon which they rely, and which it seems proper to carefully consider.

Among these is *Denver v. Hallett*, 34 Colo. 393. But that case involved simply whether or not the issuance of bonds by the city for the construction of an auditorium within the city and for public use, was a municipal purpose within the meaning of the laws of the state. The question did not involve that of aid to a private corporation, or any joint ownership or partnership with such person or corporation. It was an entirely different and distinct proposition and can in no way aid in the determination of the case at bar.

I apprehend that if the proposition there, involved an agreement between the city and a private party, wherein the city was to pay two-thirds of the cost, and a private person or corporation was to pay one-third of the cost, with each party reserving the right to separate and different uses of the building, or to different parts thereof, and coupled with the provision that the city should thereafter sell its interest therein to the private party for its own uses, the bond issue could not and would not have been sustained.

From a careful examination of the authorities cited in the able and exhaustive briefs of counsel on both sides of this controversy, and from such examination as we have been able to make in the limited time at our disposal, we do not find one that even hints that it is within the ordinary powers of a municipal corporation to construct an improvement, convenience or necessity with the avowed and declared purpose of selling the same or an interest therein, to a private person or corporation. This seems to be repugnant to every conception of the term, "municipal purpose."

In this case however, counsel contend that the agreement to sell was a mere option. But the city has expressly agreed to sell and convey title to the railroad company for a stipulated price, and the railroad company has agreed to buy and pay the agreed price. This

constitutes an executed contract, not an option. But if it were said to be an option, it is still a contract to sell, and for such reason the purpose of the city is the same,

Counsel for the city cite also as tending to sustain the validity of the proposed bond issue, the following cases: *Walker v. City of Cincinnati*, 21 Ohio St. 14, 8 Am. Rep. 24; *Sun Printing & Pub Co. v. Mayor*, 152 N. Y. 257, 46 N. E. 499, 37 L. R. A. 788; *Admiral Realty Co. v. N. Y. City*, 206 N. Y. 110, 99 N. E. 245, Ann. Cas. 1914A, 1054; *Haeussler v. City of St. Louis*, 205 Mo. 656, 103 S. W. 1034.

*Walker v. City of Cincinnati, supra*, involved the validity of an act of the legislature authorizing cities of one hundred and fifty thousand or more inhabitants, under conditions specified in the act, to provide for the construction of a line of railway over terminals, of which one should be within the city.

The specific case was, that the City of Cincinnati voted bonds for the construction of, and did construct a railroad extending from the City of Cincinnati, to the City of Chattanooga, in the State of Tennessee.

The provision of the Ohio constitution said to be violated was; "The general assembly shall never authorize any county, city, town, or township, by vote of its citizens or otherwise, to become a stockholder in any joint stock company, corporation, or association whatever; or raise money for, or loan its credit to, or in aid of any such company, corporation or association."

It will be seen that the provision of the Colorado constitution is broader and more exclusive than the one stated, in that it denies this power to the state as well as to corporate subdivisions, and uses the terms, "directly," or "indirectly," "in any manner," "public or private," "for any amount," or for "any purpose whatsoever," or "become responsible for any debt," "contract or liability," "in or out of the state," "make any donation to," "grant, or in aid of," "subscribe to," "shareholder in," "joint owner with," etc.

But in that case the purpose of that section of the constitution was distinctly stated to be; "the mischief which this section interdicts is a business partnership between a municipality or subdivision of the state, and individuals or private corporations or associations. It forbids the union of public and private capital or credit, in any enterprise whatever. In no project originated by individuals, whether associated or otherwise, with a view to gain, are the municipal bodies named, permitted to participate in such manner as to incur pecuniary expense or liability. They may neither become stockholders nor furnish money or credit for the benefit of the parties interested therein. Though joint stock companies, corporations and associations only are barred, we do not doubt that the reason of the prohibition would render it applicable to the case of a single individual. The evil would be the same, whether the public suffered from the cupidity of a single person, or from that of several persons associated together."

Such action of the city was there sustained upon the sole ground that it was the exclusive enterprise of the city. This is the view expressed by the same court in later cases, and it was expressly stated in *Cincinnati v. Dexter,* 55 Ohio St. 93, that "In *Cincinnati v. Walker,* the constitutionality of the act is there placed upon the ground that the construction of an improvement of that kind, to be owned exclusively by the municipality, does not involve an alliance of public and private capital or credit, nor constitute a loan of municipal credit to, or raising money for, or in aid of other parties, incorporated, or unincorporated, and, therefore, it is as competent, by legislation to authorize municipal corporations to construct improvements of that nature, and provide means therefor by taxation, when deemed essential to the public interests, as to authorize them to acquire and hold property for other needed public uses, and make other municipal improvements."

In the case of *Pleasant Township v. Aetna Life Ins. Co.,* 138 U. S. 67, 34 L. Ed. 864, 11 Sup. Ct. 215, the

court speaking through Mr. Justice Brewer, so recognized the distinction made by the Ohio court in the Cincinnati case. This was a case arising under the provision of the Ohio constitution and under which, aid to a railroad corporation was held to be repugnant.

Discussing the spirit of such a constitutional provision as we are now considering, it was said:

"The significance of its inhibition is read in the evil which it was intended to remedy. Common was the practice, theretofore, of issuing municipal bonds to aid in the construction of railroads. The practice was felt to be evil, stimulating unnecessary railroad enterprises, and injuriously affecting the interests of the taxpayer. The universal method of railroad enterprises was through private corporations. The possibility of other methods was unknown, or not seriously contemplated. So, when the people by their constitution prohibited public aid to private corporations, obviously the thought was that all public assistance to the building of railroads was prohibited. The ingenuity of the lawyer and the legislator, by means of which the letter of this prohibition was avoided, and a city enabled to construct a railroad running from itself to other parts of the county, as a great highway of approach and distribution of its business, was obviously not expected or foreseen. We are not criticising the decision in *Walker v. Cincinnati,* 21 Ohio St. *supra,* as an erroneous construction of the constitutional provision. We simply note the fact that the statute therein construed was a skillful avoidance of its generally understood scope."

Since the Cincinnati case was decided, the supreme court of Ohio has considered the same question in other cases and in each of these, has denied the validity of a statute authorizing a grant of aid to a railroad corporation.—*Taylor v. Commissioners of Ross Co.,* 23 Ohio St. 22; *Jacob Wyscaver et al. v. W. H. Atkinson et al.,* 37 Ohio St. 80; *Counterman v. Doublin Township,* 38 Ohio St. 515.

*Taylor v. Commissioners, supra,* is a very exhaust-

ive discussion of the question and it was there said, among other things:

"But the tenth section is a constituent part of the plan or method provided by the act for accomplishing its objects. That section provides, that the 'County Commissioners shall have power, and they are hereby authorized, to lease said road, constructed under the provisions of this act, before or after completion, * * * or to sell the same for such compensation and upon such terms as may be agreed upon by said commissioners and lessee or purchaser. * * * Thus, by section ten, it appears the commissioners, or other public authorities operating under the act, are invested with authority to sell or lease the road either before or after completion. It would be within their power to sell what is called the road at any time; certainly after the making of the contract. Now, in such case, what is sold? Substantially the right to use the public bonds to construct a work which becomes the property of the purchaser as fast as it is built."

And again: "The extent of such aid can make no difference. The mandate of the constitution is, that such aid shall never be authorized. Whatever is furnished must be exacted by taxation; and whether the amount be large or small, to recognize the authority under which it is sought to be imposed, would be to deny the protection guaranteed by the constitution to every tax-payer."

In *Wyscaver v. Atkinson, supra,* after quoting and approving the doctrine of other Ohio cases it was said:

"And I will add, that it make no difference whether the scheme for the union of public and private money or credit, originates with the party or parties representing the public or the private interests. In short, the thing prohibited is the combination in any form whatever of the public funds or credit of any county, city, town or township with the capital of any other person, whether corporated or unincorporated, for the purpose of promoting any enterprise whatever. From these views it is plain that the statute before us manifests an intent to do

that indirectly which, if done directly, would consti-
tute a palpable infraction of the constitution, for
which reason it must be declared inoperative and
void.''

*Sun Printing Co. v. Mayor, supra,* involved the valid-
ity of a statute authorizing cities of over a million in-
habitants to construct railroads therein which shall be
deemed public highways, at their own expense, etc.

This was a case where the city of New York con-
structed at its own expense a system of subways for
transportation purposes. The city was to own these in
perpetuity and to lease the use thereof to a private cor-
poration for a limited term. The subways were to be con-
structed entirely within the city and for the use of the
public therein. The court held that this was not in viola-
tion of a constitutional limitation similar to our own,
for the reason that the improvement was to be constructed
entirely by the city, to be owned by the city and in per-
petuity, and that it was not in aid of a private corpora-
tion, nor was there any joint ownership, nor mingling of
public funds with that of private persons or corpora-
tions. But it was held in that case that such a lease by
the city in perpetuity, would be in violation of the con-
stitution, and construed the leases proposed, to be for a
limited term only.

That case clearly distinguishes the right of a city to
construct and perpetually own as its sole property, such
a public improvement, from a joint ownership, or, aid
of, or the loan of the city's faith or credit to a private
corporation.

Speaking of the constitutional inhibition, the court
said:

''This provision should be construed with refer-
ence to the evils it was intended to correct. It first
found place in the Constitution in 1874. Prior to
this, there had been upon the statute books that which
was commonly known as the Town Bonding Act.
Under it numerous railroads had been built upon
the bonds procured from towns through which they
were constructed in return for stock issued by the

corporations. The inhabitants of the towns were induced to give their consent through supposed benefits that would result to their property and upon representations that the earnings of the road would provide dividends upon the stock, with which they could pay their bonds. In some instances the bonds were procured and sold and the roads never built. In many other cases the roads in a few years were sold out under foreclosure of mortgages and the stock cut off. So great was the evil and so heavy was the burden upon the towns that relief was sought through a constitutional provision. It was this evil that the provision in question was intended to correct, and with this situation in view it should be construed. There had been, at that time, no attempt on the part of municipalities to construct and own railroads. Such a project had not been publicly promulgated, discussed or contemplated. The towns had subscribed for the stock in private corporations and in most instances they had lost. Hence, the provision that they should not give any money or loan their credit to or in aid of any individual, association, or corporation, or become owners of stock or bonds of any such individual, association or corporation. This was not intended, nor does it prohibit municipalities from constructing their own roads and paying therefor when necessary and authorized by the legislature.''

It was further said in that case, that ''we do not understand that the views above expressed are in conflict with the Ohio cases. In that state the constitution does not limit municipal expenditures to 'a city purpose.' We do not, however, wish to be understood as approving of those cases, especially in so far as they sustain the right of a city to construct a railroad mainly outside of its own territory and state.''

In the case at bar, there is not only the objection that there is a grant of lease in perpetuity, but of an absolute sale of the tunnel itself, reserving only an easement for the possible purpose of conducting water and electricity through it, and which shall in no way inter-

fere with the railroad's exclusive and perpetual use for railway transportation purposes.

The case of *Admiralty Realty Co. v. City of New York, supra,* involved the question of the lease of the subways then constructed and owned by the city, and of the construction of additional subways, by the city and to be owned by it, and the lease by the city of all these.

This was no different in principle from the case of *Sun Printing Co. v. Mayor, supra,* and it was expressly said:

> "It is to be noted that there is no provision that the city shall loan its credit by guaranteeing payment of the bonds by which it is assumed the Interborough Company will raise the money which it is to expend."

The case of *Haeussler v. City of St. Louis, supra,* was one which involved an issue of city bonds for the following purpose:

> "For the construction and maintenance of a municipal bridge for public use by railroads, street cars, vehicles of all kinds and pedestrians, over and across the Mississippi river and located within the corporate limits of said city of St. Louis, and the state of Illinois, and for the purchase of all lands to be used for approaches in connection therewith, and which said bridge shall at all times, be and forever remain a free bridge; *provided,* however, the city reserves the right to grant franchises for the use of such bridge for public service purposes, upon such terms and compensation as may be prescribed by ordinance; and, provided further, that no such franchise shall confer an exclusive right in respect to such public service purposes upon the grantee thereof."

This was authorized by a state statute, and by an act of congress permitting one end of the bridge and the approach thereto in the state of Illinois.

But here likewise, the city exclusively was to construct and forever own the bridge, and which was to remain a free bridge forever, with the right of the city to

grant franchises but not exclusive, for the use of such bridge for public service purposes.

It was held in that case that this was not in violation of a constitutional provision similar to the one we are discussing and the reason therefor was expressly stated as follows:

"These ordinances in no wise violate the constitutional provisions quoted. Under these ordinances not a dollar is given to any individual or corporation, nor by them has the city become a subscriber to the capital stock of any railroad or other corporation. On the other hand, the city is to be the absolute and sole owner of the proposed public improvement, and is to have the absolute and sole control and management thereof. Similar constitutional provisions in like cases have been discussed by the courts, and in practically every case the holdings are against the contentions of the plaintiffs.— *Sun Printing & Pub. Co. v. Mayor, etc., of N. Y.,* 152 N. Y. 257, 46 N. E. 499, 37 L. R. A. 788; *Brooke v. Philadelphia,* 162 Pa. 123, 29 Atl. 387, 24 L. R. A. 781; *South St. Paul v. Lamprecht Bros. Co.,* 88 Fed. loc. cit. 454, 31 C. C. A. 585; *Prince v. Crocker* (Boston Subway Case) 166 Mass. 347, 44 N. E. 446, 32 L. R. A. 610; *Walker v. City of Cincinnati et al.,* 21 Ohio St. loc. cit. 55, 56, 8 Am. Rep. 24; *Pleasant Township v. Ins. Co.,* 138 U. S. loc. cit. 74, 11 Sup. Ct. 215, 34 L. Ed. 864.

It may be true that, under the terms of the ordinances and the law, the city can grant to railway and street car corporations the right to use the public highway, so constructed, owned and controlled by it; but that does not change the ownership nor the control. Such is true of every highway controlled by the city. Such privileges can be granted, provided the public way is not seriously impaired for public use."

It should be noted that in no case brought to our attention involving a similar constitutional provision, has the right of a state, city, county, township or other corporate entity of the state, been sustained to aid a pri-

vate corporation, by means of subscription to stock, the issue of bonds, by joint interest or ownership, or through direction or indirection, or by any means or device whatsoever. Indeed, this question has been so well settled by the Supreme Court of the United States, and appellate courts of the states, that we find no recorded case since that of *Pleasant Township v. Ins. Co., supra,* decided in 1891, in which there has been an attempt to violate, or evade such a constitutional limitation, until the present case.

All cases cited as tending to sustain the contention of the city here, are those wherein the municipality is the sole contributor to the enterprise and the sole owner thereof, and in perpetuity. In none of such cases was there commingling of public and private funds, in any form or manner whatsoever. That a city may, with the good faith purpose of constructing or enlarging a municipal water plant, construct a tunnel or other improvement, reasonably necessary to convey its supply of water or an essential part thereof, to the city and at any point beyond the limits of the city, cannot be questioned.

This power is clearly conferred by section one of the 20th article, and has been universally held to exist, as implied within the express power to construct, own and maintain such municipal water plant. But this must be by the municipality alone, and as being a public purpose for which taxes may be levied.

The question presented here is entirely different from that where a city undertake to construct such a tunnel, with such necessary and good faith purpose, with its own funds, and to be so exclusively owned by the city. But the proposed bond issue here, is clearly both in letter and spirit, within the inhibition of secs. 1 and 2 of art. XI, of the constitution, and is void. So holding, it becomes unnecessary to consider the question concerning the length of time for which such bonds may run.

The judgment is reversed with instruction to overrule the demurrer and proceed in accordance with the views expressed in this opinion.

*En banc.*

Mr. JUSTICE GABBERT dissenting:

At an election held May 20, 1913, section 355 of the charter was adopted by the electors of the city. By this section a tunnel commission was created, and provisions made for the issuance of bonds to raise funds with which to construct the "Moffat Tunnel", and on February 17, last, the taxpayers of the city, voted in favor of issuing such bonds. It is the validity of these bonds which is the subject of inquiry, and the only question involved in this proceeding, and the question thus presented must be determined by ascertaining whether the city, by our fundamental law, the constitution of the state, is without power, or is inhibited to create an indebtedness by the issuance of the bonds in question, for the purposes and under the conditions specified in section 355 *supra,* and the contract hereafter noticed, in order to raise funds with which to construct the tunnel. The amendment to the charter, section 355, and the authorization of the voters to issue the bonds are legislative acts adopted by the people of Denver under their charter. It is elementary, as often declared by this court, that a legislative act will not be declared unconstitutional, unless it is clearly and palpably so, and in cases of doubt every intendment will be made in favor of its constitutionality, and that courts will only interfere in cases of clear and unquestioned violations of the fundamental law. In other words, a legislative act must be held constitutional, unless its unconstitutionality is established beyond a reasonable doubt.

The majority opinion declares the city is without authority to authorize the issuance of the bonds involved, because inhibited by sections 1 and 2 article XI of the constitution. With due deference to the majority, it is submitted, that this is not tenable. In substance, so far as material to consider, sections 1 and 2 article XI pro-

vide that a city shall not lend or pledge its credit, directly or indirectly in any manner to, or in aid of any corporation for any amount, for any purpose, or become responsible for any debt, or liability of any corporation, nor shall it make any donation to, or in aid of any corporation, or become a joint owner with such corporation. That neither of these provisions is violated, is clear when section 355 of the charter, and the contract entered into between the tunnel commission, and the Denver and Salt Lake Railroad Company are analyzed. Section 355 creates a tunnel commission, and confers upon that body all the powers granted to the city by article XX of the constitution, and otherwise existing by operation of law; authorizes the commission to acquire, construct, build, or assist in building, a tunnel through the main range of the Rocky Mountains, in the vicinity of James Peak, and the necessary approaches thereto, to be known as the ''Moffat Tunnel'', for the purposes of transporting freight, passengers, water, and electricity; provided that in the event the tunnel shall be originally constructed for the transportation of freight and passengers, the right shall be reserved by the city in perpetuity to construct and operate through such tunnel suitable apparatus for conveying water and electric current from the western to the eastern portal for the use of the inhabitants of the city, and to permit the use of the tunnel, upon a fair and equitable basis, by any and all railway lines desiring such use. It also provides the commission may arrange that a portion of the funds needed for the construction of the tunnel may be furnished by corporations, and that the commission may enter into contracts with such corporations with reference to the construction, control, future lease, sale, or disposition of the tunnel, but expressly provides that until the city shall have been reimbursed in full for all moneys expended by it with interest, and is discharged from all financial liability in connection therewith, it shall retain the ownership of the tunnel, and that the rights reserved to utilize it for the trans-

portation of water and electricity, shall be perpetually retained, notwithstanding, any sale or lease of the tunnel.  The section then provides that if on investigation the commission shall find that the construction of the tunnel is desirable and feasible, that that body shall determine the amount of bonds necessary to be issued for that purpose, and may by ordinance of the city council, submit to the vote of the taxpaying electors, the proposition of issuing such bonds, and if it is carried, that annually thereafter, a tax shall be levied to raise funds to discharge the interest and the principal of the bonds as they mature, unless suitable provisions for these purposes are otherwise made, and finally declares, "The inhabitants of the City and County of Denver, by the adoption of this Charter Amendment, do find and declare that the said tunnel will, in their judgment be of local use and convenience to the people, and that it is also absolutely essential to the future growth and welfare of the said City and County".

After the adoption of this section the commission entered into a contract with the Denver and Salt Lake Railroad Company, which owns and is operating a line of railroad from Denver west, the salient features of which are as follows:  The tunnel shall be constructed by the commission and two thirds of the cost, or three million dollars is to be paid by the city, and one-third by the railroad up to four and one-half million dollars, and the excess above that amount, if any, is to be paid by the company; that the amount to be paid by the company shall be deposited with a depository, to be mutually agreed upon, or secured in a suitable manner; that the company shall pay the interest on the bonds and provide a sinking fund to discharge them at maturity, and that the consideration for the obligations which it thus assumes, is the right to operate and maintain the tunnel for railroad purposes, and ultimately acquire it for this purpose.  It requires the railroad company, upon the request of the city, to allow any other railroad company to use the tunnel, and its tracks and facilities for a

distance of thirty miles east and a distance seventy-five miles west of the tunnel, upon specified conditions. The contract requires the company to commence work upon the extension of its road from Craig to Salt Lake contemporaneously with the commencement of work upon the tunnel, and complete it within five years after the completion of the tunnel. By the contract the company is given the option on or before the maturity of the bonds, to purchase the tunnel by the payment of the principal of such bonds, and accrued interest thereon, but this option is subject to the perpetual right of the city to transport through the tunnel, water and electric current, and also subject to the perpetual right reserved by the city to have the tunnel, approaches and tracks outside used by other railroads. In other words, the option extends only to the purchase of the tunnel by the company for its own railroad operation purposes, and does not give the company the right, in the event of such purchase, to interfere with the use of the tunnel by the city for any of the other purposes for which it is to be built by the city. The company is to operate the tunnel for railroad purposes at its own expense. Finally, the contract provides that if the company, after completion or during the construction of the tunnel fails to pay the interest on the bonds or deposit the necessary amount in the sinking fund, or comply with any other material provision of the contract for three months, it may be terminated by the commission, and all moneys paid by the company thereunder forfeited and held as liquidated damages. It contains other provisions which are not of any moment in determining the validity of the bonds.

From the foregoing synopsis of the provisions of section 355 and the contract, it is apparent that there is not a word or line in either which violates, in letter or spirit, the inhibitions contained in sections 1 and 2 article XI of the constitution. The city has not loaned or pledged its credit to, or in aid of the railroad company in any amount, or in any manner, for any purpose whatever; it

has not become responsible for any debt, contract, or liability of the company, neither has it made any donation or grant to, or in aid of the company. In brief, the construction of the tunnel is undertaken by the city alone for its own benefit, and the tunnel is, and remains its own exclusive property until the option to purchase is exercised. True, the company is to furnish at least one third of the cost of the tunnel, but the city is not obligated to refund the sum thus advanced, and incurs no liability of any kind in connection with such advancement. On the contrary, if the company fails to comply with the obligations imposed upon it by the contract, it forfeits the advancement to the city. The consideration for the advancement by the company is an option to purchase the tunnel, and a lease or license to lay tracks in the tunnel, and operate its trains through the same. It would certainly be an anomalous proposition to say that because the city had undertaken to construct the tunnel it was without authority, for a valuable consideration, to contract in advance to sell or lease it for one of the purposes for which it was constructed. No such inhibition is found in the provisions of the constitution under consideration, and it is impossible, in my opinion, to deduce from either section 355 of the charter, or the contract, that by this arrangement the city has pledged its credit to, or in aid of the company; become responsible for its debts, or made a donation to it. The option to purchase and lease or license given the company is nothing more than the exercise of wise business judgment on the part of the commission, which assures the use of the tunnel for one of the main purposes for which it was designed, and in effect provides for a return upon the investment by the city, until the option to purchase is exercised, and then if exercised, leave such rights in the city as will enable it to require the purchaser to permit the use of the tunnel by other railroad companies, and the other purposes for which it is designed. Nor in the event the company purchases the tunnel, nor under the arrangement existing, until the option to purchase is exercised, is

there any joint ownership which the constitution inhibits. The tunnel is the property of the city. It has no interest whatever in the railroad or its operation; this belongs exclusively to the railroad company, and in case it purchases the tunnel its ownership is for a purpose with which the city is in no manner connected. The city will still have the right to use the tunnel for the transportation of water and electricity, but this right belongs to it alone. The joint ownership which the constitution inhibits, is a joint ownership for the same purpose or use. Neither can it be said that because the section provides that the commission may assist in building the tunnel, it thereby lends aid to a coropration which the constitution inhibits, as that would depend upon whether under any contract the commission entered into, by virtue of provision of the section, aid was given contrary to constitutional restrictions. It is therefore manifest that plaintiff in error has not only failed to establish beyond a reasonable doubt, that section 355 of the charter or the contract violate the constitutional provisions under consideration, but it appears clearly and beyond question that they do not.

Suppose the tunnel commission had been given power in the first instance to construct the tunnel at the expense of the city, by the issuance of bonds, and after it had been constructed, had been authorized in a legal manner to enter into a contract with a railroad company, operating a line of road from the city west, to lease the tunnel to the company for railroad purposes, and give it an option to purchase the tunnel, it certainly could not be said that such authority was inhibited by the constitution. Between such an arrangement and the one made there is no difference in effect or principle, except that the commission by entering into the arrangement it has in advance, as authorized to do by section 355, has exercised sound business sense, for the reason provision has been made before any money is expended which assures the use of the tunnel for the transportation of freight and passengers, the payment of a valuable consideration upon the

money expended, and for a sale which will reimburse the city for all expenditures. Such an arrangement is to be commended, rather than condemned upon the theory that thereby constitutional limitations are violated, when in effect it is simply the exercise of good business judgment.

Counsel for plaintiff in error contend that the city is without power to issue the bonds because a municipal corporation cannot exercise any powers except those expressly granted, or fairly implied as incident to such powers, or those essential to the declared objects and purposes of the corporation. This is a sound proposition of law, but in no sense applicable. Denver is operating under a special charter by virtue of the provisions of article 20 of the constitution. *In Walker v. The City of Cincinnati*, 21 Ohio St. 14, 14 Am. Rep. 24, an act of the legislature of Ohio which empowered the city to build a railroad from the city to Chattanooga, was under consideration. The supreme court of Ohio held, that unless prohibited by the constitution it was within the legitimate scope of legislative power to authorize a city to construct a railroad in which it had a special interest. In this connection it should be noted, that Judge Dillon in his work on municipal corporations, from which counsel for plaintiff in error have quoted extensively, says in effect, that in the absence of special restrictive constitutional provisions, it is competent for the legislature to authorize a municipal corporation to construct railways in which such corporation has a special interest, and impose upon its citizens taxes for that purpose. If Denver could construct a railroad to Salt Lake, including the tunnel, clearly it may construct one of the important links in the line, namely, the tunnel alone, on its own account, and in consideration of a railroad company aiding in constructing it, give such company a lease and option to purchase. Otherwise the tunnel would not benefit the city. Our own court has repeatedly held that the object of article XX was to confer upon the people of Denver, not only the powers expressly mentioned in that article, but every

power the legislature theretofore possessed in making a charter for Denver.

It was upon the basis that the people of the city of Denver possessed power to legislate with respect to charter provisions that we held in the Auditorium case, (*Denver v. Hallett*, 34 Colo. 393.) it was within the power of the people of the city of Denver to provide by charter for the erection of an auditorium, and to issue bonds to discharge the indebtedness for that purpose, for the reason that the people of the city possessed the power to legislate on this subject. That is precisely the situation in the case at bar. Authority has been conferred upon the tunnel commission to build the Moffat tunnel, through legislation by the people of the city, which they have the power to enact. They have provided for the issuance of bonds for this purpose; they have declared that the tunnel will be of local use and convenience to the people, and that it is absolutely essential to the future growth and welfare of the city. It is manifest from the topography of the country west of the city, the necessities of the city, and the beneficial results which will follow the construction of the tunnel that these declarations have ample foundation upon which to base them. If the city could build an auditorium, which it was evident was not necessary for any municipal purpose, in the ordinary meaning of that term, and could not result in any financial benefit to the people of the city, except as it would serve to attract national conventions of various organizations which might meet here at long intervals of time, it certainly cannot be successfully asserted that the electors of Denver may not make provision by appropriate legislation, to construct a tunnel for the transportation of freight and passengers which will be of benefit to the people every day in the year.

Counsel for defendants in error contend that special authority is conferred upon the city to construct the tunnel under article XX of the constitution. It is unnecessary to discuss this question as it is clear the city is not inhibited from constructing such tunnel by that section.

Counsel for plaintiff in error suggest.that some portions of section 355 are invalid because they undertake to empower the city to engage in business which it cannot be permitted to engage in. In answer to this it is only necessary to say, that where a part of an act is unconstitutional it does not vitiate the part that is good, when the good and bad can be clearly separated, and the good is complete in itself, and does not depend upon the void portion. They also urge that the section violates section 8, of article XI of the constitution. In the opinion of the writer this contention is not tenable.

In my opinion the judgment of the district court sustaining the validity of the bonds should be affirmed.